JAMES A. ALEXANDER, assignee, &c.,

v.

SARAH N. BERNEY and others.

1. A corporation may acquire a name by usage, as by retaining its original name after a change thereof was authorized by an act of the legislature, and an adjudication in bankruptcy made against it by the name so acquired is valid.

2. The assignee in bankruptcy of an insurance company may cause to be set aside the cancellation of a mortgage belonging to such company, where such cancellation was made under a resolution of the directors, obtained by the fraud of the president for his benefit, and without consideration.

3. But advances by a director, made to pay the debts of the company, and secured by a mortgage upon the land so discharged, will be protected.

Bill to set aside cancellation of, and to establish mortgage and to foreclose. On final hearing on pleadings and proofs.

*Mr. H. Wallis* and *Mr. J. F. McGee*, for complainant.

*Mr. T. N. McCarter*, for Armstrong's executors.

*Mr. J. Flemming*, for Benjamin Dutton.

THE CHANCELLOR.

This suit is brought to set aside the cancellation of a mortgage on land in Hudson county, given by Alfred Berney and his wife to the American Plate Glass and Fire

Alexander v. Berney.

Insurance Company, on the first day of August, 1871, for $77,500 and interest, and to foreclose it. On the 29th of March, 1872, the mortgage was cancelled of record, pursuant to a resolution of the board of directors of the company passed at a meeting held on the 27th of that month. The consideration of the cancellation was, according to that resolution, the delivery by Berney to the company of drafts to the amount of $14,000, drawn by him, in favor of the company, upon Thomas D. Armstrong, the execution of a mortgage to the company for $27,000 on part of the same property (called the Cavan Point property) covered by the mortgage for $77,500, and the delivery to the company by him of what the resolution terms other valid securities, to the amount of $36,500. These sums amount in the aggregate to $77,500.

The bill alleges that this cancellation was fraudulent on the part of all parties concerned therein, and that the company, in fact, received no consideration whatever therefor. By resolution of the 1st of April following, passed after the mortgage had actually been cancelled under the former resolution, it was declared that the company held the mortgage for $77,500 as security for only $66,500, and that it had accepted in lieu of it a new mortgage on the premises for $27,000; a mortgage on Smith's Island, in Virginia, for $35,000; the acceptances of the company for $1,500 and $3,000 in cash. On the 28th of March, 1872, Berney and his wife gave to Thomas D. Armstrong a mortgage on part of the premises covered by the mortgage for $77,500, to secure the payment of $27,000 with interest. The consideration of it was $18,500 paid by him to them, $7,000 for the par value of his stock in the company, then sold to them, and the above mentioned acceptances, then held by him, which were the company's acceptances of two drafts, each for $750, drawn upon it by Daniel Messmore. The taking of this mortgage by Armstrong was dependent on the cancellation of the $77,500 mortgage, or the release therefrom of the part of the premises covered by the mort-

gage to him, which was to be the first mortgage on the property described therein. Armstrong and the Berneys and Dutton have all answered.

The bill seeks to establish the $77,500 mortgage and to foreclose it, and claims for it priority over the mortgage to Armstrong, on the ground that when that mortgage was given the company was insolvent, and that he, being a director of it, knew or ought to have known that it was insolvent, and that he knew of and was a party to the withdrawing by that transaction from the assets of the company of the $77,500 mortgage, and the cancellation thereof without any .consideration whatever, and in fraud of the creditors and stockholders. It alleges that the conveyance to Dutton was without consideration and in furtherance of the fraud.

The first question to be considered is, whether the complainant has the right to sue, which he claims, seeing that he prosecutes as, and merely as, assignee in bankruptcy of the American Plate Glass and Fire Insurance Company, whereas the name of that corporation was, by an act of the legislature of this state, approved April 4th, 1872, changed to the "America Insurance Company." *P. L.* 1872, p. 1301. That act is entitled "An act to amend an act entitled an act to incorporate the American Plate Glass and Fire Insurance Company of New Jersey." It provides for the change of the name, for the increase of the capital stock, and for increasing the number of directors, &c., &c. Though the act declared that it was to take effect immediately, it appears that the fees required by law to be paid before it could take effect were not paid until on or about the 30th of June, 1872, and it had not the force or effect of a law until then. *P. L.* 1858, p. 220. It appears, indeed, that on the 16th of April of that year the card of the America Insurance Company was published in a Jersey City paper, and was continued therein for a while, but that card was signed by Mr. Moies as president, and he, on the 21st of that month, receipted for the securities of the company as president of the American Plate Glass and Fire Insurance Company of New Jersey.

Again, it appears that the company never conducted its business in the new name, but always in the original one, and it conducted it according to the plan of the original act. It issued its policies and stock and drew its checks, up to the close of its business, in the original name. Through its own use of its original name exclusively after the passage of the amendatory act, it, so to speak, regained its original name after its name had been changed by the act, and by that name it could lawfully be sued and be proceeded against in bankruptcy. A corporation may acquire a name by usage. Indeed, the corporation under consideration appears to have been generally known, by its own user of the name, as the American Plate Glass and Fire Insurance Company before the passage of the amendatory act, although, by its charter, its name was the American Plate Glass and Fire Insurance Company of New Jersey. The complainant has a right to maintain this suit.

That the company was fraudulently conducted, almost if not quite from the beginning of its operations, there is no room to doubt. Some of the directors appear to have been dissatisfied with the way in which it was managed, and to have suspected Berney, the president, of the fraud of which he was undoubtedly guilty. They left the company on an agreement by which the company returned to them, on surrender of their stock, the money and securities paid and given by them for the stock they held, and so the management of the concern was practically turned over to Berney. It appears that he designed to obtain possession of and cancel the $77,500 mortgage, which represented at the time so much of the assets, (though estimated only at $66,500, because that valuation had been put upon it by the insurance commissioner of New York,) and in the effort he had the acquiescence and active co-operation, so far as their votes were concerned, of a majority at least of the other members of the board; though as to some, and perhaps all of them, it was probably through undue confidence in him and the consequent acceptance as true of his repre-

sentations as to the securities which he proposed to substitute for it. This mortgage was at the time the only valid security in the hands of the company. Almost all the others were of the most fraudulent character, and had been palmed off upon it, in exchange for its stock, by the most flagitious deceit. Among them were a mortgage on 450 acres of land in Middlesex county, made by a man who never had any title or claim of title to the mortgaged premises; another on 6,644 acres of land in Ocean and Monmouth counties to which the mortgagor never had title—a tract of about ten miles square, and including the villages of Bricksburgh and Burrville—and mortgages on other property, in Philadelphia, in Chicago, in West Virginia and in this state, all of which were worthless. Prior to the passage of the resolution of March 27th, Berney had, according to the evidence, attempted to cancel the $77,500 mortgage surreptitiously, but had been foiled by the persistence and determination of one of the directors, who compelled him to return it to the company's office. The statement of the consideration of the cancellation in the resolution just referred to, was entirely false. The mortgage was, nevertheless, cancelled on the 29th of March. The resolution of April 1st speaks of it as still held by the company, although it had in fact been cancelled, and authorizes the giving up of the mortgage to Berney or his wife, and the cancellation thereof in consideration of a new mortgage for $27,000 on part of the mortgaged property, a mortgage of $35,000 on Smith's Island, in Virginia, the acceptances of the company for $1,500 and $3,000 in cash. The mortgage on Smith's Island was a fraud; the $27,000 mortgage was given, but was taken into his possession by Berney, as president. It was never recorded, and was not found among the assets of the company on its failure, and cannot be found, and it has never been accounted for. The arrangement stated in this last resolution was intended to be in substitution for that stated in the resolution of March 27th.

There is evidence that the company was, at the time of the passage of the last mentioned resolution, in great need of money to meet losses which had occurred in the great fire in Chicago, and had applied to Thomas D. Armstrong for a loan to answer the then present exigency, and that so great was its need that it was believed by those in charge of its business that unless he would extend the accommodation, it must fail. The company offered to assign to him for his security, if he would make the loan, any of its securities, and notably the $77,500 mortgage. He consented to extend the needed assistance, but chose to lend the money to Berney rather than to the company. Berney was indebted to the company, and he would thus be enabled to pay the debt, and so the company would be in funds to pay the pressing claims before referred to. To enable Berney to secure the sum of $27,000 to Armstrong, by mortgage of part of the premises covered by the mortgage of $77,500, it was proposed that the latter mortgage should be cancelled on the delivery and payment to the company in its stead of other securities and money, as stated in the resolution of April 1st. After the passage of that resolution, Armstrong paid to Berney and his wife, as the consideration of the $27,000 mortgage, $18,500, all of which was paid over to the company and used in the payment of its debts. The balance of the consideration was the before mentioned two acceptances of $750 each, which were delivered to Berney, and Armstrong's stock in the company, which Berney and his wife bought from him at par, $7,000. The company does not appear to have been insolvent at the time of this transaction, if the $77,500 mortgage be reckoned among its assets. If it was, Armstrong appears not to have known it. Indeed the evidence is that the strongest assurances were given to him by the president and secretary and Messmore (one of the directors who claims to have negotiated the loan) that the company was abundantly able to pay all its debts and liabilities.

It is insisted by the complainant that Armstrong must have known, and ought to be held to have known, that the company was fraudulently conducted; and it is also insisted that, in making the loan in question, he must be held to have had knowledge that the $77,500 mortgage was cancelled without any consideration in fact. The evidence shows that he was not willing to make the loan to the company, but was willing to make it to the Berneys, and the board of directors were willing that the transaction should take that shape. Berney owed the company $15,000 for so much money which they had loaned him to enable him to pay off the mortgages on the property prior to the $77,500 mortgage. As security, they held an assignment of certain leases on the property. On payment of the money, he was entitled to a re-assignment of the leases. On receipt of the money, the company would be enabled to pay its pressing debts. Armstrong was willing to lend him the money on first mortgage of the property covered by the $77,500 mortgage. The company, to obtain the money due from Berney, was willing to release that part of the property and accept other security instead of it. There is no reason to believe that Mr. Armstrong was aware of any intention on the part of Berney to defraud the company with the Smith's Island mortgage or to pay the acceptances, as he did subsequently, with the company's own money. Armstrong resigned his office as director on the 27th of March, intending thus to sever all connection with the company and to relieve himself from all responsibility for the management of its affairs. The complainant, indeed, insists that the resignation was not presented until the 1st of April, but the weight of evidence is that Armstrong resigned on the 27th of March.

To the extent of the amount of money actually paid by him, including the amount of the acceptances and interest, Armstrong's executors are entitled to the protection of equity. But not beyond that amount. His sale of his stock to the Berneys was not, under the circumstances, a consideration which ought to be recognized. The stock was then,

in fact, of no value whatever.   The abstraction of the $77,500 mortgage from the estate rendered the company insolvent.   The company was in difficulty pecuniarily.   He had been, from the beginning up to that time, one of the · board of directors, and the transaction in which he was enabled to sell his stock was, in fact, (though not, as far as appears, to his knowledge,) except so far as the money advanced by him was concerned, a fraud on the company. He severed his connection with the direction of the company, in order that the security he proposed to take might not be affected by that connection.   To the extent of the amount for which he sold his stock, a good security of the company was cancelled, without consideration, and a worthless one substituted for it.   He must have been aware that the business of the company was and had been conducted on false pretences as to its cash assets, but, notwithstanding that fact, his estate is entitled, under the mortgage given to him, to protection to the extent of his *bona fide* advances of money for the payment of the lawful debts of the company, especially since it does not appear that he was aware of the existence of any fraud in the transaction in which the mortgage was given, or any of its parts.   His stock stands on a different footing.

It remains to consider the defence of Mrs. Berney and Mr. Dutton.   She insists that the $77,500 mortgage was on her own separate property; that it never was delivered to the company, and that she never received any consideration for it.   The evidence is that that mortgage was upon land bought by her husband, though the conveyance was taken in her name, and that the entire purchase money, $15,000, was secured to be paid by his bonds, with mortgages on the premises executed by him and her.   These mortgages were paid off with money borrowed by Berney and his wife from the company, and repaid with the loan from Armstrong. The testimony makes it evident that she was merely the depositary of the title, in trust for her husband, and that the property was his in fact.   But, however that may be,

Alexander *v.* Berney.

the mortgage came into the hands of the company in the course of business. She says, indeed, that it was through fraudulent abstraction from her; but her story on this score is entitled to no credit. She says she placed it, after she had acknowledged it, in her bureau drawer, and did not know it was gone until after the death of her child, which took place in December, 1871, and that she then made efforts to have it returned to her. She admits, however, that she did not see any of the officers of the company, except her husband, on the subject. It appears that the mortgage was dated and acknowledged on the 1st of August, 1871, the day on which the company commenced business. It was given for stock, and on that day 853 shares, of the par value of $100 per share, were issued to her and receipted for by her husband. She paid $7,800 by her acceptance on account of stock on the same date. The mortgages and the acceptance together amount to the par value of the stock. It appears that the counsel of the company certified to this mortgage on the 21st of August, 1871. It was, therefore, then in the possession of the company as one of its assets. Again, she sold some of this very stock for $1,000, receiving in part payment a mortgage, which she, with her husband, assigned. The $77,500 mortgage was in the hands of the company as one of its assets from the beginning up to the time when, in the latter part of March, 1872, it was cancelled of record. Further, in February, 1872, her husband borrowed the money of the company to pay the encumbrances on the property prior to that mortgage, and the repayment was secured by an assignment by him and her, to the company, of leases given and held by her on the property. It is impossible to resist the conclusion that the mortgage was executed to the company, to be delivered on account of the stock, and that it was delivered accordingly, and was, in all respects, on the day when it was cancelled, a valid security in the hands of the company for the full amount thereof. The estimate put upon its value by the New York insurance commissioner, or by the

company itself, manifestly cannot affect the question as to the amount due upon or recoverable under it.

The cancellation was obtained by a gross fraud, and ought to be absolutely set aside, unless Mr. Dutton is entitled to protection. The conveyance to him was made on the 1st of April, 1872, the day on which the resolution was passed under which the Armstrong mortgage was given. He is Mrs. Berney's father. He gave his note for $25,000, payable in a year, for the consideration. He had paid nothing on it when the bill was filed. He was a laboring man, worth but little, comparatively, at his own estimate. After this suit was commenced he took up this note, he says, by giving smaller notes and a patent-right for some invention of his own. He cannot tell the amount of these notes, nor the consideration of the assignment of the patent-right. He says he gave the new notes as long as six months after the note for $25,000 became due. That was payable in one year. He gave the other notes for it, then, not earlier than October, 1873. The bill was filed on the 25th of February in that year. Mrs. Berney's account of the matter is no more satisfactory. She says she does not know how many notes her father gave her for the property; that she has them at home; that she does not remember whether they were all given at the same time, and that she does not remember when the first note was given, nor what its amount was. Again, she says that she has not given to her husband all that she received from that conveyance; that she did not give him all the notes that she had; that she is not positive that she gave him the first note she received, but thinks she did. On cross-examination she says that the note given by her father was for $25,000, and that she still holds it. When Dutton was examined in this suit, in March, 1873, he had never received any of the rents of the property, nor paid anything upon it. Berney had collected the rents. Dutton, when he was examined, did not know in what county or town the land was situated, what the annual taxes on the property were, nor what rate of interest the mortgages,

subject to which it was conveyed to him, bore. Indeed, it appears very satisfactorily that the conveyance to him was without consideration, and was part of Berney's plan to withdraw the $77,500 mortgage from the company. Dutton cannot be regarded as a *bona fide* purchaser for a valuable consideration. The complainant is entitled to a decree establishing his mortgage, notwithstanding the cancellation, except as against the Armstrong mortgage, to the amount of $20,000 and interest, less any amount received under the assignment of leases and applicable to the payment thereof.