RUTH HELEN BARLOW, RESPONDENT, v. SHAWNEE INVESTMENT COMPANY, APPELLANT.—48 S. W. (2d) 35.

Kansas City Court of Appeals.   February 29, 1932.

52

*Morrison, Nugent, Wylder & Berger* for appellant.

*James K. Houghton* for respondent.

TRIMBLE, P. J.—On December 6, 1929, plaintiff or claimant, widow of Lloyd D. Barlow, filed with the Missouri Workmen's Compensation Commission, her claim for an award of compensation for the death of her husband, alleging that he, while an employee of the "Shawnee Credit Corporation" was killed on July 29, 1929, by accident arising out of and in the course of his employment. The referee of the Commission heard the claim and on March 25, 1930, denied the same. Application for review of said finding by the full

Commission was filed on April 2, 1930, and, after same was had, the full Commission on June 12, 1930, rendered its final award, including a "Finding of Facts" and "Statement of Facts and Rulings of Law," reversing said referee's finding and awarding compensation in the lump sum of $6,025.69 to "Ruth Barlow for herself and as natural guardian of Eula Margaret Kelly, thirteen-year-old step-daughter of deceased, the former to give proper bond before the award is paid." Thereupon said employer, Shawnee *Credit Corporation,* on June 14, 1930, gave notice and appealed to the Circuit Court of Jackson County, Missouri, where the appeal came on to be heard on the 22nd day of July, 1930 (it being a part of the regular May, 1930, term of said court), and the same was heard and taken under advisement; and at the *March,* 1931, term (March 21, 1931), the final award of the Commission was affirmed and judgment was rendered by the Circuit Court in favor of claimant, Ruth Helen Barlow, "for herself and as natural guardian of Eula Margaret Kelly," for the sum of $6,025.69 in a lump sum, with six per cent interest from July 30, 1929, amounting to $592.46 making a total of $6,618.15, against "Shawnee *Investment Company, appellant."*

In due time, to-wit, on March 26, 1931, motions for new trial and in arrest were filed by the "Shawnee *Credit Corporation,* appellant." On April 15, 1931, claimant, Ruth Helen Barlow, filed a motion to set aside the judgment and dismiss the appeal of the "Shawnee *Credit Corporation"* from the Commission to the circuit court, on the ground that the Shawnee *Credit Corporation,* which gave the notice of appeal from the final award of the Commission, was *not a party to the award,* and had no interest therein.

On April 25, 1931 (being still the March term of that year), the "Shawnee *Investment Company,* employer and appellant," filed motion in the circuit court to allow it to amend notice of appeal from the Commission to the circuit court, by changing the signature to said notice of appeal to "Shawnee *Investment Company."* This motion the court, on the same day, April 25, 1931, overruled "for want of jurisdiction." On the same day the court overruled claimant's motion to set aside the judgment and dismiss the appeal from the Commission to the circuit court, which motion had been filed April 15, 1931, as heretofore stated.

On the same day the motion was overruled, namely, April 15, 1931, the motions for new trial and in arrest which had been filed March 26, 1931, were heard and *taken under advisement* until the *May* term (June 8, 1931), when they were overruled, the defendant saving its exceptions. Whereupon, "Shawnee *Investment Company,* the employer appellant in the above entitled action" filed affidavit for appeal. The appeal was allowed and time was granted to file bill of exceptions.

The *original* claim for compensation filed with the Commission on December 6, 1929, stated the name and address of the employer to be "Shawnee *Credit Corporation,* 416 City Bank Building, Kansas City, Missouri." The *amended* claim, however, gave the names and addresses of *all* employers as "Shawnee *Investment* Company, a *Missouri* Corporation (formerly Shawnee *Credit Corporation,* a Missouri Corporation), *and* Shawnee *Credit Corporation,* a Delaware Corporation, successor to the business and liabilities of Shawnee *Credit* Corporation, 416 City Bank Building, Kansas City Missouri."

The answer to the *original* claim was filed by the Shawnee *Credit Corporation,* and the *amended* answer thereto gave name of employer, and its address, as "Shawnee *Credit Corporation,* City Bank Building, Kansas City, Mo.," and stated that the "employer and insurer deny claim for compensation because the accident did not arise out of and in the course of the deceased's employment, it being an accident with which the employer had no casual connection."

But the *amended claim* gave the names and addresses of all employers as "Shawnee *Investment Company,* a Missouri Corporation formerly Shawnee *Credit Corporation,* a Missouri Corporation) *and* Shawnee Credit Corporation, a *Delaware* Corporation, *successors to the business and liabilities* of Shawnee *Credit Corporation,* 416 City Bank Building, Kansas City, Missouri."

Attached to said amended claim, under the head of "Additional Statements," were the following:

| "March 30th, 1926. | "Certificate of Incorporation of Shawnee Investment Company (Missouri). |
|---|---|
| "June 25th, 1929. | "Certificate of Change of Name to Shawnee Credit Corporation (Missouri). |
| "July 29th, 1929. | "Accident as reported. |
| "August, 1929. | "Incorporation of Shawnee Credit Corporation (Delaware). |
| "Sept. 26th, 1929. | "Transfer of assets and business, subject to liabilities from Shawnee Credit Corporation (Missouri), to Shawnee Credit Corporation (Delaware). |
| "Oct. 8th, 1929. | "Shawnee Credit Corporation (Missouri), changes name to Shawnee Investment Company (Missouri)." |

It will be observed that after the final award of the Commission was affirmed by the circuit court, judgment was rendered against "Shawnee *Investment* Company" but the motions for new trial and in arrest were made and filed by the "Shawnee *Credit Corporation*" and the affidavit for appeal was filed by an agent for, and the appeal was allowed to, the "Shawnee *Investment Company,* appellant employer."

After the appeal reached this court and was called to our attention, it was set at the head of the December call, December 7, 1931, that being the nearest available date of "precedence" to be given it as required by Section 3342, Revised Statutes of Missouri, 1929.

Before that date was reached, however, claimant Barlow (respondent), "appearing specially and for the purpose of this motion only," filed a motion to dismiss the appeal of the Shawnee *Investment Company* and to award ten per cent damages for frivolous appeal. This motion was ordered to be "taken with the case" whenever the latter was argued and assigned, which was done on the day heretofore mentioned, December 7, 1931.

The foregoing somewhat lengthy preliminary statement has been rendered necessary in order to properly consider and dispose of said motion to dismiss appeal, and to this motion we will now address ourselves.

## On Motion to Dismiss Appeal.

The first point to be disposed of is that *this* appeal should be dismissed for the reason that it was not taken in time. It will be observed that the judgment affirming the Commission's final award was rendered by the circuit court at the *March* term (March 21, 1931), after the matters had been held under advisement from July 22, 1930, of the *May term,* 1930, to the March term, 1931; that on March 26, 1931 (which was within the four days allowed by Section 1005, Revised Statutes of Missouri, 1929, as one of the intervening days, March 22, 1931, was Sunday; State v. Harris, 121 Mo. 445), appellant under the name of Shawnee Credit Corporation filed its motions for new trial and in arrest. These motions were, at the same *March* term, April 25, 1931, heard and *were by the court taken under advisement to the May term,* 1931 (and until June 8, 1931, thereof), when they were overruled and the appeal was thereupon taken. Since, therefore, the judgment was rendered at the *March* term and the appeal was not taken at the same term at which the judgment was rendered, claimant contends it was therefore too late, citing State ex rel. v. Haid, 38 S. W. (2d) 44, 54, 55. This case, however, is not like the one at bar in several important particulars. In the Haid case the judgment was rendered at the *October* term, 1928, at which term relators filed their motion for new trial and *nothing more seems to have been done* or even *attempted* to be done *at that*

*term;* but at the *December* term following, the motion for new trial was overruled and appeal taken. In that case too there was *no need* for a bill of exceptions nor for a motion for new trial in order to pave the way for an appeal. In the case at bar, there *was*, or appeared to be, *need* of a motion for new trial, *and* for a bill of exceptions, since the court was called upon to rule upon matters which were the subjects of objection and exception and which were *dehors* the record until made so by a bill of exceptions and preserved by said bill and by motion for new trial.

Furthermore, unlike the Haid case, the trial court, in the case at bar, on its own motion *took the ruling* on the motion for new trial *under advisement until the next term,* at which term it was overruled and the appeal was taken. What else could the appellant employer do but to wait until the court had reached a decision on the matter? It had filed its motion at the judgment term, and had *presented* and *argued it at that term,* but the court, not being satisfied as to what should be done with the motion, *took it under advisement.* Matters are thus in a far different situation from what they would have been had appellant merely contented itself with filing the motion in time and then allowed the whole matter to drift along until the next term. We think this action of the court in taking the matter under advisement until the next term had the effect of carrying the cause and the taking of the appeal over to the next term the same as in the case of ordinary appeals in other cases. The Haid case mentions and clearly provides for different situations which would create exceptions to the rule therein announced, and while the situation created by the court's action in the case at bar, in taking the matter under advisement, was not *specifically* mentioned, it would seem to be necessarily included in, and covered by, the exceptions that were mentioned.

We have not heretofore mentioned them, but the reasons for the necessity of a motion for new trial and a bill of exceptions in this case, or in other words the matters *dehors* the record calling for a bill and for such motion in order to preserve them, appear or are shown in what now follows:

Deceased Lloyd D. Barlow, thirty-five years of age, was on the 29th day of July, 1929, in the employ of the Shawnee Credit Corporation which later became the Shawnee Investment Company. Deceased was an outside collector for the company and was by it furnished with a car owned by the employer with which to travel about within certain territory and collect delinquent accounts due his employer. The upkeep and operating expenses of said car were paid by the employer. The latter supplied Barlow, the employee, with cards showing the names and addresses of the delinquent debtors, and the employee was required to devote all his time throughout the day to his duties. His working hours were from eight A. M., to

six or seven P. M. No place was designated by the employer for the storage of the car, and consequently the employee kept the car at his own home in Kansas City, Missouri. About four o'clock on the afternoon of July 29, 1929, as the employee Lloyd D. Barlow was going east on Fortieth Street in the aforesaid car furnished by the employer, alongside another car, and just after he met and almost struck a third car coming from the opposite direction, his car swerved to one side and crashed head on into a tree in the parking on the south side of Fortieth Street about midway between Warwick Boulevard and Hyde Park Avenue. (We will discuss the competency of this evidence later.) In this block Fortieth Street slopes somewhat sharply to the east.

The bark of the tree was knocked off for about four or five feet from the ground. The car was wrecked, both the front wheels were broken, the front axle was bent, the radiator was shoved back almost to the dashboard, the front part of the engine was broken loose from the frame and rested on the left fender. The steering wheel was bent nearly double. The car was standing on its two rear wheels and the front end of the car was resting on the car's tie rods.

The employee was removed from the car in an unconscious condition, and was placed on the parkway. His head and legs were cut and his chest was injured. He appeared to be in great agony and kept putting his hand to his chest. He was taken to St. Luke's Hospital and died there about noon of the following day, July 30, 1929. He never fully regained consciousness except for a few minutes at the hospital shortly after he arrived there. At this time he roused sufficiently to recognize his wife and remarked to her that he had turned out to avoid hitting a car or to keep it from hitting him. (We will discuss the competency of this evidence later.)

In the car was found a leather folder belonging to deceased and which he carried with him as he made his rounds collecting. This contained eight, ten or a dozen cards belonging to the employer showing the delinquent accounts which deceased had for collection. He had made one collection, and a small amount of currency was also found, which the president of the employer company took charge of, and he it was who directed that the employee be sent to the hospital, engaged the doctors and called at the hospital that evening and the next morning.

The employer had never filed any election to accept the provisions of the Workmen's Compensation Act in Missouri, nor had the employer taken out any insurance as required by the act, nor did it give any notice of the accident to the Commission. Nor had either the employer or employee filed any notice of rejection of the act. The officers of the employer were in Kansas City, Missouri, and the contract of employment was made in this State.

The evidence tended to show that the widow, Ruth Helen Barlow, as well as Eula Margaret Kelly, thirteen years old and stepdaughter of deceased, were both totally dependent on Lloyd D. Barlow.

In the "Statement of Facts and Rulings of Law" made by the Commission, the referee award was set aside and the following findings were made: That said employer had more than ten employees regularly employed; that it had not rejected the act, and that the Commission had jurisdiction to consider the claim; that deceased employee was in the employment of the Shawnee Investment Company, as a collector of delinquent accounts; that the employer furnished him with a car for the purpose of making said collections, and for this purpose was furnished with cards giving names and addresses of those owing accounts, the amount each owed, etc.; that he had no definite route to go nor working hours, but worked from about eight o'clock in the morning to somewhere about eight-thirty in the evening; that the injury occurred as heretofore stated and with the result as heretofore stated, including the finding of the leather case, the cards and the one collection heretofore mentioned.

The "Statement of Facts and Rulings of Law" further stated that:

". . . on July 29, 1929, the deceased employee was in the employment of the Shawnee Investment Company. That he was a collector of delinquent accounts in Kansas City, Missouri, and Kansas City, Kansas. The employer furnished him a car for the purpose of making said collections, and although he had no definite working hours, the evidence shows that he worked from around eight o'clock in the morning to as late as eight-thirty in the evening. The decedent was furnished with certain cards by his employer, said cards setting out the names and addresses of the accounts which he was to collect, amount of same, etc. On July 29, 1929, about four P. M., while going along Fortieth Street between Hyde Park Avenue and Warwick Boulevard, in Kansas City, Missouri, his car crashed into a tree, and as a result of injuries therefrom, he died on July 30, 1929. Mr. Frank C. Baker, president of the Shawnee Investment Company, appeared at the scene of accident and while there he secured a leather case in which the employee carried the necessary papers for his collections, and Mr. Baker testified that there were six, eight or ten cards of the employer's in said case, which cards represented parties on whom the employee was to call to make collections, and also that one collection had been made that day.

"The employee had no definite routes to go over, but he simply was given the cards denoting the account she was to attempt to collect, and the route which he chose to collect same was left to him. The employer contends that claimant has failed to show that the employee was in the business of his employer at the time of the accident.

"It is the law that where an employee charged with the performance of a duty is found injured at the place where his duties may have required him to be, there is a natural presumption that he was injured in the course of, and in consequence of, the employment. [See Wahlig v. Krennig-Schlapp Grocer Co., 29 S. W. (2d) 128; Capital Paper Company v. Conner, 81 Ind. App. 547.] In the subject case, there is no direct evidence as to what Barlow was doing at the street where and at the time, he received the fatal injury; but since, as shown by the evidence, his work required him to travel in all parts of the city, the routes for his different days work being of his own choosing, and since the evidence shows that he had six, eight or ten accounts which he had not yet collected, it is a legitimate inference that the accident which resulted in the injury and death of Barlow arose out of and in the course of his employment.

"The evidence shows that the employee was, prior to the accident, afflicted with a sort of disease which would affect him in such a way that for two or three minutes he would be extremely nervous, have a blank expression on his face, etc. At such period it appears he did not have much, if any, control over his actions. The employer contends that it was one of the above attacks, which caused him to collide with the tree. However, if we concede that he did have these attacks there is no definite proof whatever that he had an attack and same resulted in the accident. A conclusion in that regard would be based purely and simply on surmise and conjecture. As this defense seems to be an affirmative defense, same falls short of proof."

By stipulation of the parties, made before the referee at his hearing, it was agreed that the Shawnee Credit Corporation, a Missouri Corporation, on July 29, 1929, was the employer and that Lloyd D. Barlow, deceased, was in the employ of the Shawnee Credit Corporation, a Missouri corporation, on July 29, 1929; that the Shawnee Credit Corporation did not elect to come under the Missouri Workmen's Compensation Act. It was further stipulated that "the questions at issue" are:

"1. Whether or not the employer, Shawnee Credit Corporation, was on July 29, 1929, a major or minor employer.

"2. Whether or not Lloyd D. Barlow, the employee, sustained an accidental injury resulting in his death and arising out of and in the course of his employment.

"3. Question of dependence."

(The last question, namely, that of dependence, is not in controversy on this appeal.)

After the entire record, made up before the referee and the Commission with its final award, which included the evidence of a number of witnesses as to the happenings at the collision and other matters relating to whether the appellant employer was a minor or major employer, the said defendant employer prayed the court to

give declarations of law lettered consecutively from A. to K. both inclusive and also prayed the court to give findings of fact numbered consecutively from 1 to 11 both inclusive.

The declarations of law related to whether the Commission acted in excess of its powers, and asserted that the facts did not support the award found by the Commission, and that there was not sufficient evidence in the record to warrant the making of the award "for the reason that no written notice of the time, place and nature of the injury was shown to have been given to the employer within — days after this accident, which failure to give notice was not found to have been for good cause, or to have been unprejudicial to the employer. [See Sec. 38, Laws of 1925, p. 395; Sec. 3336, R. S. 1929.]"

Other declarations were those showing the theory on which the court would properly decide the review of the Commission's final award. Such as that the burden of proving the accident causing death arose out of and in the course of the employment was on the claimant and that she failed to sustain such burden; that the burden of proving appellant was a major employer was on claimant and she failed to sustain such burden; that the employer was a minor employer within the meaning of Section 4, Laws 1925, page 378 (Sec. 3302, R. S. Mo. 1929).

The finding of facts prayed for related to the finding that the proximate cause of the employee's death was a personal disease and that the accident did not arise out of the employment. Other findings related to the different employees relied upon by claimant to show that the employer was a "major employer," i. e., that it had "more than ten employees regularly employed." [See Sec. 3302, supra.]

The cause was thereupon submitted to the court on the whole record including the above mentioned declarations of law and findings of fact and the cause was by the court taken under advisement until the March term, March 21, 1931, when, as heretofore stated, judgment refusing the findings of fact and declarations of law, and affirming the final award of the Commission, was rendered. Exceptions were taken and duly saved by "the defendant Investment Company (employer)." Then, as stated, on March 26, 1931, its motions for new trial and in arrest were filed. Then, on April 15, 1931, still at the March term, claimant's motion to set aside judgment and dismiss appeal was filed, and on April 25, 1931, still at the March term, defendant Shawnee Investment Company, as heretofore stated, filed its motion for leave to correct signature to the "notice of appeal." These motions were both overruled on the last named date, and thereupon on said 25th of April (March term, 1931), the motions for new trial and in arrest were "taken up and submitted to the court and after hearing arguments on said motion for new trial and motion in arrest of judgment, the same were by the court

*taken under advisement."* Afterwards at the May term (June 8, 1931), these motions were both overruled and the appeal to this court was taken.

It would seem, therefore, that in this case there were numerous matters *dehors* the record which called for a bill of exceptions to preserve them and also called for motions for new trial and in arrest. It will not do to say that, under the established procedure in a compensation case there is no need for the matters *dehors* the record hereinabove shown, and therefore the case should be treated as if no bill of exceptions nor motions for new trial and in arrest had been filed. The defendant employer has the right to *test* the question of whether it can have the matter of its liability determined in this way. Nor can it be said there was nothing in the declarations of law and findings of fact which were necessary to a determination of the questions involved. The fact that the court *thought* they were so, enough to cause him to take the whole matter under advisement, is sufficient to justify the carrying of the case over to the next term. The court did not *decide* to refuse all of the decalarations and findings *until he had taken time to be advised thereon.* We do not apprehend that the Legislature, or the Supreme Court in the Haid case, were so anxious to *expedite* the proceedings in a compensation case as to attempt to compel the trial court to rule on all matters at once at the judgment term whether the court felt the need of further advisement and consideration or not. Such an intention is not to be imputed to these high authorities. Neither would the best interests of the employer, nor of the employee for that matter, be conserved by thus increasing the danger of rendering erroneous decisions.

But, even if there be nothing in all that has been said herein which would justify the carrying of the case over from the judgment term, there is another principle which operates to relieve defendant employer of the consequences of not having taken its appeal at the judgment term. That is the principle of *stare decisis* (if we may, for convenience, stretch the meaning of that Latin phrase to cover the situation here). The judgment in the case at bar was rendered March 21, 1931. The case of State ex rel. v. Haid was decided *after that,* to-wit, on April 7, 1931. It overruled City of Macon v. Public Service Comm., 266 Mo. 484, and Dougherty v. Manhattan Rubber Mfg. Co., 29 S. W. (2d) 126, which last case was decided April 7, 1930, nearly a year before this case now on appeal was passed upon by the trial court. The cases of Brocco v. May Department Stores Co., 22 S. W. (2d) 832, and Lilly v. Moberly Wholesale Grocery Co., 32 S. W. (2d) 1099, were also overruled by the Haid case. When, therefore, the case at bar was decided, the controlling cases, especially the Dougherty case, governed the procedure herein, at the time the action herein was taken. Hence, under the ruling in the Haid case,

at page 53 of 38 S. W. (2d), the appellant in the case now before us should not be allowed to suffer because of the change of the rule announced in that case. For while the *appeal* was taken June 8, 1931, the *judgment* and the *action compelling* the appellant to defer taking its appeal until that date, was had before that time, to-wit, at the *March* term of that year.

In our opinion, therefore, there is nothing in the claimant's contention that the appeal herein should be dismissed because not taken at the judgment term.

It is claimed that the appeal should be dismissed because the Shawnee Investment Company did not take the appeal. This point, and many others on this feature of the case, go to the difference in *name* of the various corporations involved, attention to which has already been called herein.

We find no merit in the point raised on the difference in the names used to designate the appellant employer. The whole record shows there was really only one corporate entity involved in the case at any time, though designated by different names.

The name of the employer was given in the original claim as Shawnee Credit Corporation. This corporation filed answer and all proceedings were had thereafter against that corporation until the filing of the *amended* claim in which the employers were designated as "Shawnee *Investment Company,* a Missouri corporation (*formerly Shawnee Credit Corporation, a Missouri corporation*)" and "Shawnee Credit Corporation, a Delaware corporation, successor to the business and liabilities of Shawnee Credit Corporation." This merely designates the Delaware corporation (not as employer) but as the *successor* of the business and liabilities of the other. At the hearing before the Commission on February 4, 1930, where both claimant and employer were represented, a stipulation was entered into whereby Shawnee Credit Corporation, a Missouri corporation on July 29, 1929, was named as the *employer;* and the Delaware corporation was never referred to again. Claimant's amended claim, under the head of additional statements, as hereinbefore stated, shows March 30, 1926, certificate of incorporation of Shawnee Investment Company (Missouri); June 25, 1929, certificate of change of name to Shawnee Credit Corporation (Missouri); July 29, 1929, accident as reported; August, 1929, Incorporation of Shawnee Credit Corporation (Delaware); September 26, 1929, transfer of assets and business subject to liabilities from Shawnee Credit Corporation (Missouri) to Shawnee Credit Corporation (Delaware); October 8, 1929, Shawnee *Credit Corporation* (Missouri) *changes name* to Shawnee Investment Company (Missouri).

The referee's award designated the employer as Shawnee Investment Company and it was so designated by claimant in her application for review. The Commission made this review and, reversing

the referee, granted an award solely against the Missouri corporation under the name of the Shawnee Investment Company.

In the hearing before the full commission, claimant's counsel, in his examination of witnesses, recognized that the Shawnee Investment Company was the same as the Shawnee Credit Corporation by expressing that thought in his questions. For example, he asked Mr. Nelson: "You are vice-president of the Shawnee Investment Company, *formerly the Shawnee Credit Corporation of Missouri?*" And he later asked the same question of Mr. Baker, except that the name of the office was changed to "president" instead of "vice-president."

On the Commission's docket there were entries which designated the employer as "Shawnee Credit Corp., a Mo. corp., *now known as* Shawnee Inv. Co., a Mo. Corp.," and throughout the hearings and until the referee's award, the employer was designated on the official records of the Commission as "Shawnee Credit Corporation, a Missouri corporation, now known as Shawnee Investment Company."

In the body of the notice of appeal by the employer from the Commission's award the employer is designated as Shawnee Investment Company and in the signature it is Shawnee Credit Corporation. The notice was accepted and acted upon by the Commission and the record was transmitted to, and filed in, the circuit court, where the parties *appeared for hearing*, without objection, and after argument the award *was affirmed*. The caption of the motion for new trial designated the employer appellant as Shawnee Credit Corporation and the clerk in writing the record used the same name, but calls it the appellant. The motion itself says it is by "employer appellant" and is signed by attorneys for "appellant." The first time any objection was taken to this difference in names was on April 15, 1931, long after the appeal had been taken from the Commission to the circuit court, after claimant and her counsel had appeared and participated in the hearing without objection and after motion for new trial had been filed. This objection was by a motion to set aside the judgment to dismiss said appeal. No contention is made that the notice was in reality given by the Delaware corporation, but only that the Shawnee Investment Company filed no notice of appeal from the award, and that the notice of appeal from the award was filed by the Shawnee *Credit* Corporation which was not a party to the record. Appellant thereupon filed a motion for leave to correct the signature to the notice of appeal on the ground that the use of the name of Shawnee Credit Corporation was a mere clerical error, and that employer was designated as Shawnee Investment Company. Both motions were overruled, and as claimant took no appeal from the order overruling her motion to dismiss, it would seem that such order became final and could not be re-opened now. Section 3342, Revised Statutes of Missouri, 1929, pro-

vides for an appeal merely "by filing notice of appeal with the Commission." It does not require even that the opposite party be notified. The only purpose to be accomplished is to inform the Commission so that it may transmit its record with all the papers to the circuit court. The Commission was in no wise misled. The awards made were against the Missouri Corporation under the name Shawnee Investment Company, the case was carried on under the name of "Shawnee Credit Corporation, a Missouri corporation, now known as the Shawnee Investment Corporation, a Missouri corporation."

The notice of the appeal was no more insufficient than the one in Igo v. Bradford, 110 Mo. App. 670, and it was held sufficient. In the case of Louis v. Steel, 17 S. W. (2d) 546, it was held, even in cases where notice of appeal is jurisdictional, that even if there be errors or irregularities therein, yet if it is served on the proper person and if it shows that it refers to a particular judgment and can refer to no other, it will be regarded as sufficient. In 46 C. J., sec. 53, p. 553, it is said:

"Where the statute does not prescribe a form, the question ordinarily is whether the notice actually given constitutes a substantial compliance with the statute."

At page 554 of said Section 53, it is said:

"Mere informalities do not vitiate notices so long as they do not mislead, and give the necessary information to the proper parties."

The use of the different names amounted to no more than a *mere misnomer*. As to these, 14 C. J., sec. 389, p. 324, and sec. 391, p. 325, it is said at the former page:

"The general rule, therefore, is that the mere misnomer of a corporation in a bond, note, or other deed or contract does not render the same invalid or inoperative, but the corporation may sue or be sued thereon in its true name with proper allegation and proof that it is the corporation intended; and its identity may be established by parol evidence. Nor will a grant or conveyance to or by a corporation be invalidated by a misnomer if its identity as the corporation intended is established."

And at the latter page, Section 391, it is said:

"The misnomer of a corporation in pleadings and otherwise in judicial proceedings has the same effect as a misnomer of an individual."

At the same page 325, it is said:

"As a general rule the misnomer of a corporation in a notice, summons, notice by publication, garnishment, citation, writ of *certiorari*, or other step in a judicial proceeding is immaterial if it appears that it could not have been, or was not, misled."

And at page 326, it is said:

"The misnomer of a corporation in a statutory notice is not fatal where it appears that it could not be or was not misled."

In bankruptcy, a corporation which has changed its name, but continues to use its original name may be proceeded against under its former name, and an adjudication under that name is valid. [Alexander v. Burney, 28 N. J. Eq. 90.] So also a railroad may be sued under a name it has acquired by usage. [Wilkins v. McCorkle, 112 Tenn. 688, 692.]

In 47 C. J., Sec. 319, p. 173, it is said:

"According to some authorities the names of parties which are used in an action or proceeding should be adhered to throughout the proceedings. However, it has been held that one sued by a wrong name may use his right name in subsequent proceedings, although no dilatory plea has been filed."

A misnomer may be waived, and was in this case waived, by both parties. [Bedell v. Richardson Lubricating Co., 226 S. W. 563; see, also, Green v. Strother, 201 Mo. App. 418, 421.] Claimant not only showed by her pleadings that the two named corporations were in fact one and the same entity, but she also waived the difference if there was any. [Bartschat v. Downing, 172 Mo. App. 636; see, also, Munroe v. Dougherty, 190 S. W. 1022, 1025; Roberts v. Meek, 296 S. W. 195.]

There was, moreover, no question as to the identity of the employer or of the corporation sued. See 33 C. J., sec. 132, p. 1200, where it is said:

"The record must show the identity of the parties mentioned in various stages of the suit; or, in other words, there must not be a variance between the parties for or against whom the judgment is rendered and the parties indicated by the pleadings. The principle of *idem sonans* may be invoked, however, to obviate a variance in the names of the parties to the judgment, and where, upon an inspection of the whole record, the identity of the parties named in the judgment and the pleading is clear, the apparent variance will be held to be a clerical misprision and immaterial, or at least amendable. A variance may be waived."

In Parry v. Woodson, 33 Mo. 347, 348, it is said:

". . . A name is a means of identity; but the change of the name or the application of a wrong name does not change the thing identified. It is not the name that is sued but the person to whom it is applied. Process served on a man by a wrong name is as really served on him as if it had been served on him by his right name, and if in such case he fail to appear, or appearing fail to object that he is sued by the wrong name, and judgment be rendered against him by such name, he is as much bound by the judgment as if it had been rendered against him by his right name. The use of the right name is every way preferable, since without it as a means of identi-

fication the evidence of the identity of the person sued may in process of time become lost, and hence the propriety of the amendment in this case; but so long as the defendant can be identified as the one against whom the judgment was rendered, he is as much bound by the judgment, and those claiming under the judgment are as much entitled to its benefits, to all intents and purposes, as if the defendant has been sued by his right name.''

As to mere informalities in motions for new trial, see 46 C. J. 314; Tillet v. Lynchburg, etc., R. Co., 21 S. E. 698; Kimball v. Whitney, 15 Ind. 280; Martin v. Pevely Dairy Co., 17 S. W. (2d) 567, and Sec. 821, R. S. Mo. 1929.

The motion to dismiss the appeal herein should be, and is, therefore, overruled.

### ON THE MERITS OF THE APPEAL.

With reference to the merits of the case on appeal, it should be said at the outset that ''employer, appellant'' strenuously contends that ''the award against it was rendered without jurisdiction and without sufficient competent evidence to support it.''

We have not failed to keep in mind, not only in ruling on the legality of the appeal but also in deciding the case on the merits, that the employer in this case *never elected* to come under the provisions of the Missouri Workmen's Compensation Law (Chap. 28, R. S. Mo. 1929). But such employer never filed written notice of its election to *reject* said chapter, and hence it *may be* ''conclusively presumed to have elected to accept the provisions of this chapter'' and to furnish compensation as therein provided. [Sec. 3300, R. S. Mo. 1929.] However, such employer is not required to elect or reject said law, nor can it be ''conclusively presumed'' to have accepted the law, *if* it is a *minor* employer (i. e., one who has ''ten or less employees regularly employed'' and ''is not engaged in an occupation hazardous to employees).'' [Sec. 3302, R. S. Mo. 1929.] Consequently, the Compensation Commission has no jurisdiction or power to consider the claim herein if the employer had less than ten employees regularly employed. It was not engaged in a hazardous occupation.

Under Section 3342, Revised Statutes of Missouri, 1929, the Commission finds the *facts* and such findings are *conclusive,* except where on appeal the court, with power to review *only* questions of *law,* shall modify, reverse, remand for rehearing or set aside its award upon any of the following grounds and no other:

''1. That the Commission acted without or in excess of its powers.

''2. That the award was procured by fraud.

''3. That the facts found by the Commission do not support the award.

"4. That there was not sufficient competent evidence in the evidence to warrant the making of the award." [Sec. 3342, R. S. Mo. 1929.]

The first question to be determined herein, then, is whether or not the appellant employer is a major or minor employer. Of course, if there is competent evidence in the record before the Commission, on *both* sides of the question, then the Commission's finding thereon is conclusive, since we cannot decide the *facts,* but can only pass on questions of *law.* But if there is *no evidence* to show that the employer is subject to the Compensation Act, or, which is the same thing, if the evidence in claimant's behalf, relied on to support her contention that the employer comes within the purview of the act, is not competent in law (for instance, that it is wholly hearsay), then we can say, as a matter of law, that there is not sufficient competent evidence in the record to show that the employer was within the purview of the act, and that the Commission acted without power, or in excess of its powers. Section 3301, Revised Statutes of Missouri, 1929, renders the employer, if under the purview of the act, liable for personal injury to or death of, the employee "by accident arising out of and in the course of his employment." As we understand it, there must be evidence in the record tending to show both of these things, i. e., that it *arose out of* the employment and also that it was *in the course* thereof. [Smith v. Levis-Zukaski Merc. Co., 14 S. W. (2d) 470, 472.] If, therefore, the record, as a matter of law, fails to show that the accident arose out of and in the course of the employment, then we are justified in holding, and have the power to hold, that "there was not sufficient competent evidence to warrant the making of the award." Consequently the two questions we are called upon to decide, and decide as matters of law, and not as matters of fact, are: 1. Is there any competent evidence anywhere in the case tending to show that the employer comes within the purview of the act, i. e., that the employer had more than ten employees regularly employed? 2. Is there any competent evidence anywhere tending to show that the accident arose *out of* and in the *course of* the employment?

Upon the first of these questions, the appellant urges that since it was stipulated at the hearing before the Commission that one of the questions was "whether or not the Shawnee Credit Corporation was on July 29, 1929, a major or minor employer," therefore that is the *only* date to be considered in determining the question whether the employer had "more than ten employees regularly employed," and no investigation of the number of employees can be had as to any date *prior* to that time. We do not understand the stipulation to mean that it is agreed that the *number of employees* actually at work or employed on that particular day is *determinative* of the question whether the appellant was a major or minor employer on that date.

The stipulation is that the question is whether or not the corporation was a major or minor employer on that day. Whether it was or not is a question of law under the facts shown in evidence. If the evidence is such as to raise an *issue* as to the facts, then the Commission has the exclusive power to decide those facts. But after the facts are established, then the question of whether an employer is a major or minor employer becomes one of law and is to be thus determined and not controlled by any implication arising from a stipulation. Nor does the stipulation prevent an investigation of the *employment* of employees for a time prior to the date of the accident in order to ascertain the status (i. e., whether they be "regularly employed" or not) of the employees at the time in question. The Section 3302, Revised Statutes of Missouri, 1929, defines a major employer as one "who has more than ten employees regularly employed." Paragraph (d) of Section 3305, Revised Statutes of Missouri, 1929, also says that an employee who is "employed by the same employer for more than five and one-half consecutive work days shall for the purposes of this chapter be considered a *regular* and not a *casual* employee." The law does not provide that one may *not* be a regular employee *unless* he *has* been *actually engaged* in the work for more than five and one-half consecutive work days before the accident, but that where one is *employed,* i. e., hired for a work contemplating, and is actually engaged for, more than five and one-half consecutive days, he must be considered a regular employee. From the definitions used, it would seem that a "regular" employee is one who is "regularly employed" and must be included or counted in determining the number of employees "regularly employed." The word "regular" is used in the act as an antonym of the word "casual" and when an employee is *regular* or "regularly employed" he is not *casual.* This view seems to be supported by the language used in Kemper v. Gluck, 39 S. W. (2d) 330, 1. c. 332, where, after saying that the employer in that case was not engaged in a hazardous occupation, or at least the Commission had not so determined that the occupation was hazardous, the court used these words:

"Then it was a question of fact whether the defendant here employed more than ten *regular employees;* whether he was a major or minor employer." (Italics ours.)

Schneider on Workmen's Compensation, p. 133, says that, in a sense, the term "casual" is an antonym of the phrase "regularly employed" and that its construction will throw light on the question whether an employer has a certain number of employees "regularly employed" or whether some of them are *casual* so that his properly-to-be-counted employees are less than the required statutory number. Consequently, in the case at bar, if it be found by the Commission, under evidence sufficient to raise an *issue* as to the matter, that the employer has more than ten regular employees, that is, employees

under contract of employment which contemplates work for, and which employees do actually work for, more than five and one-half consecutive days, then such employer is a major employer, *unless* enough of such employees to bring the number down to ten or less, are found to be either receiving annual earnings of more than $3600, or are engaged in performing work not incident to the operation of the usual business of the employer. The relation of employer and employee under the Compensation Act is one of contract and the act is a part of every contract which comes thereunder. When the statute (Sec. 3300) says that, under certain circumstances, an employer is "conclusively presumed" to have "elected" to accept the provisions of the act, this presumption of election relates, not merely to the time of any particular accident, but refers to the term of his *status* as an employer under the law whenever that status arises. (Otherwise there would be little use in the statute requiring him to file notice of rejection *prior* to the accident.) In other words, if after having once reached the status of a major employer, his election or presumed election to accept the provisions of the act *continues*, in the absence of a written rejection, even though the number of employees may change intermittently. The act having once become a part of the employment contract, either by express election or by conclusive presumption, it can be cancelled only by written, filed, rejection. Otherwise, the employer would be in or out of the purview of the act from day to day, according as the number of his regular employees, or "employees regularly employed," fluctuated from day to day. This would be intolerable and prejudicial to both employer and employees, since neither would know what his rights were on any day until he had first taken a careful enumeration of the employees for that day, including items as to the nature of their work, the amount of their pay (whether over $3600 per year or not) and the length of time of service contemplated or actually rendered. [See Carrigan v. Western Radio Co., 44 S. W. (2d) 245.] In the case of Comerford v. Carr, 284 Pac. 121, the employer, on the date of the accident had less than the required number of employees to make him subject to the act, but several times prior to that time he had had more than the required number. It was held that, inasmuch as he had not filed a written notice of election not to accept the provisions of the act, nor that he rejected them, he was subject to the act, notwithstanding the fact that on the day of the accident he did not have the required or statutory number of employees.

Claimant, in her brief, has compiled a list of *sixteen persons* who she claims were "in the service" of the employer on the day of the accident. As to these, and the number of employees regularly employed, the record discloses the following:

1.  Jannan G. Baker, wife of Frank C. Baker (who was the president of, and a director in, the corporation, and *owner of all the stock therein,* except such few shares as were issued to persons to enable them to qualify as directors). Mrs. Baker can in no sense be termed an employee. She was a director, but received no compensation, and, so far as the record discloses, did nothing beyond the usual duties of a corporate director (owning perhaps but one share), which is to vote according to directions.

2.  Frank C. Baker, who, as above stated, served as president and director, performing the ordinary duties of those offices. He received a salary of $100 per month for those services but no other compensation and so far as the record discloses did no other work in the business outside of duties appertaining to such offices of president and director. It is doubtless true that corporate officers *may* be employees within the meaning of the Compensation Act, *if* the facts are such as to so constitute them under the law. But are the facts herein such as to constitute Baker an employee within the meaning of the act? Section 3305, Revised Statutes of Missouri, 1929, defines "employee" in the following language:

"The word 'employee' as used in this chapter shall be construed to mean every person *in the service of any employer* . . . under any contract of hire . . . *or under any appointment or election,* but shall not include persons whose average annual earnings exceed three thousand six hundred dollars . . ."

The case of Columbus Gas Co. v. Industrial Comm., 227 N. W. 292, cited by claimant in support of her contention that president Baker can be counted as one of the employees, is clearly inapplicable to the case here. The president in that case was injured while performing *manual labor* in the shop. His *principal work* was of *this character* rather than that of the ordinary duties of the president. So also in the case of Skoutchi v. Chic Cloak & Suit Co., Inc., 130 N. E. 299, the corporate officer was injured while performing his regular duties, not as president, but in packing, shipping, selling and delivering goods. He held the title of an executive officer, but at the same time was its employee and was injured while working as such. In the case of Kennedy v. Kennedy Mfg. Co., 163 N. Y. Supp. 944, the award was based not so much on the fact that the injured *former* corporate officer was an employee (though he perhaps was, but, at the time of the accident, was *not* an officer), but on the fact that the insurer had issued the policy to, and had treated, him as an employee and for that reason would not be allowed to deny that he was an employee. So also in Hubbs v. Addison E. L. & P. Co., 130 N. E. 302, the injured corporate officer, in addition to whatever his duties as such officer required, was regularly employed in manual labor in the yards and received therefor wages of $25 per week. The same is true of claimant's cited case of Dewey v. Dewey

Fuel Co., 178 N. W. 36; his wages, however, were $2 per day. He certainly was an employee. But Mr. Baker, owning practically all of the stock (*all* of it as he himself said), and doing none of the work of an employee, can hardly be said to be in the service of "an employer as contemplated by said Section 3305, supra." [Atchison v. Industrial Comm., 188 Wis. 218, 205 N. W. 806.]

3. Frank W. Nelson, who was vice-president and a director of the corporation. His duties were those of "manager" or "general manager" and he was active in the business, and first became connected with the company August 20, 1928, and has been so continuously since that time, and was, therefore, general manager on July 29, 1929, at that time receiving a salary of $3600 per year. He stated he first got $250 per month "plus ten per cent of the company's earnings," but in February, 1929, he says his salary was raised to $300 per month.

"Q. Were you paid anything else, Mr. Nelson? A. I did not withdraw any *more* than that amount.

"Q. Were you credited on the books with any more? A. It was not set up on the books as a credit to my individual name. According to our contract, I drew ten per cent of the earnings as I previously stated."

He testified that this was under a *written* contract and promised that he would produce it, but all that was produced was an *unsigned* contract in blank purporting to be to that effect. This contract in blank purported to be "by and between Frank W. Nelson and the Shawnee Credit Corporation by its President Frank C. Baker." It recited that "the said Frank W. Nelson is hereby employed by the said *Shawnee Credit Corporation* in the capacity of ———— at a salary of —— which may be changed as per mutual agreement from time to time:

"In consideration of the employment and appointment of the said Frank W. Nelson by the Shawnee Credit Corporation, it is further agreed that the said Frank W. Nelson shall be entitled to ten per cent of the net profits of the Shawnee Credit Corporation, this to be determined annually, said ten per cent of the net profits shall be applied on the purchase price of" 150 shares of the said corporation's common stock, "*now owned by the said Frank C. Baker* to be sold to the said Frank W. Nelson" at $115 per share. The contract could be terminated by either party giving thirty days' written notice. In the event of such termination the *corporation* agreed to purchase said 150 shares of stock at the then book value.

This, as stated, was not signed by either party, but there was evidence that it was drawn up for use in the consummation of the hiring contemplated, but *Baker* was quite sure it had never been executed and did not contain the precise terms of the contract under which the employment was entered into. Nelson testified it was mere-

ly a "preliminary contract" and did not represent the terms of the contract between him and the company; that when he testified that the contract was in *writing* he referred to this tentative contract. It may be observed that it is in no material way different from their *oral* evidence as to the terms of the contract, the only difference being as to the amount of stock which the employee must purchase.

The by-laws of the corporation provided:

"Sec. No. 5: No officer of the corporation shall, by virtue of his office, be entitled to any compensation unless such compensation shall be first fixed by the Board of Directors."

The corporation had no stock, and the records of the company did not show any authorization of salaries except that of $200 per month to the president, Baker, which was later reduced to $100 per month. And the evidence is that, in the absence of any such authorization by the directors, no salary could be paid to any officer. Moreover it is apparent from the evidence of Mr. Baker that this idea of having executive officers to invest ten per cent, or any other per cent, in the stock of the company was *his* idea and was to offer to the executive officer an incentive to keener and more active work, and should not be considered as earnings in the sense of Section 3305, at least insofar as this particular case is concerned. The corporation, as stated, had no stock, and was not obligated in said contract in regard thereto, and it is manifest from the wording of the contract that it was not obligated to pay anything more than the $3600 per year. The right to ten per cent of the *net* earnings (which last were of course *dividends* on the stock), would take such ten per cent, not out of the *company*, but out of the income on the stock investment owned by Mr. Baker. The promise to the employee to let him have ten per cent of the net earnings of the company was therefore a *conditional* promise, in reality, emanating from Baker personally. It. was conditioned on the event that there *would* be dividends, which in these "piping times of peace" is a very uncertain matter. So that, it cannot be said, as a matter of law, that Nelson was *not* an employee because his "average earnings exceed three thousand six hundred dollars" as provided in Section 3305. Nothing in the company's records shows that Nelson was to get, or did get, anything more than the specified $300 per month.

In what we have said, we are not undertaking to pass on the facts which do or do not constitute Nelson an employee, for that is solely the province of the Commission. All that is here said is that the evidence is such that it is a matter for the Commission, and not for this court to pass upon, and hence as said Commission has found that he *is* to be counted as one of the necessary number of employees, we cannot eliminate his name from that number. Whether a case comes within the Compensation Act is a question of fact. [Kemper v. Gluck, 39 S. W. 330, 332.] Whether

.there is any substantial evidence *whatever* tending to show that the case is, or is not, within the act, is for the courts.

In Hauter v. Coeur D'Alene A. Min. Co., 228 Pac. 259, in construing the section of the Idaho W. C. A., excluding persons from its benefit whose remuneration exceeds $2400 a year, it was held that the section was not applicable to an employee "not employed under a definite *certain* contract for a full year or more at a determined or determinable wage amounting to more than $2400."

In Miller Indemnity, etc., Co. v. Patten, 250 S. W. 154, it was held that the decedent was an "employee" and not a partner, even though, under his contract, the net profits *might* reach a figure which would entitle him to a one-third interest in the property and result in making him a partner. The contingency that his compensation *might ultimately* result from his services was not allowed to affect the question of his being an employee.

The evidence as to J. V. Quinn (secretary), is in a situation similar to that of Nelson's, except that Quinn was to get five per cent of the net earnings, and would have to buy one-half the amount of stock that Nelson was to take. Consequently, neither Nelson nor Quinn can be taken out of the list of employees in order to render the number thereof ten or less and take the employer out of the purview of the W. C. A. as specified in Section 3302.

Our statute, Section 3374, Revised Statutes of Missouri, 1929, requires that "All of the provisions of this chapter (28) shall be liberally construed," etc. The case of Marshall Field & Co. v. Industrial Comm. of Ill., 120 N. E. 773, 774, under a statutory definition of the word "employee," no broader than, and very similar to, ours, held that the definition is to be broadly construed. Of course, this means wherever there is any room for construction. "In construing the legislative definition of employee in the W. C. A. a measure of liberality should be indulged in to the end that in doubtful cases an injured workman or his dependents may not be deprived of benefits of humane provisions of the compensation plan." [McDowell v. Duer, 133 N. E. 839, 841; Hurst v. Huley, 141 N. E. 650.]

4. Mrs. Bertha Steck is another on the list of sixteen who, the appellant contends, was a *casual* and not a regular employee regularly employed. But clearly there is sufficient evidence in the record from which the Commission could properly find that she should be counted as a regular employee, regularly employed. When she first went on the stand and was asked if she were formerly an employee of the Shawnee Credit Corporation, she replied in the affirmative and then added the word "temporary." She admitted, however, that she was employed from June 19, to June 30, 1929, and drew fifty dollars for ten days' work at five dollars per day and that she was continuously in the appellant's employ until the 27th of July, 1929, drawing $115 for twenty-three days at five dollars per day, and on

said last named date went on a vacation of two weeks with the under-standing that, at the end of the two weeks, she would return, and she *did* return on August 11, 1929, and worked thereafter for a period of twelve days continuously at five dollars per day. She should therefore be counted as a regular and not as a casual employee, within the meaning of paragraph d of Section 3305, Revised Statutes of Missouri, 1929.

5 and 6. Verla Maloney and Norma Baker were also regular and *not* casual employees within the terms of the aforementioned statute. For the former was employed and worked continuously every consecutive working day from and *including* July 29, 1929, up to and including August 21, 1929; while the latter was employed and worked continuously every consecutive day from and *including* July 29, 1929, up to and including August 14th, of that year. The provisions of the Compensation Act regulate, and are a part of, the contract from the moment the employment, i. e., the status or relation of employer and employee begins. [Cameron v. Ellis Construction Co., 169 N. E. 622, 252 N. Y. 394.] ''Employment is not casual merely because it is not for any specified time.'' [1 Schneider on Workmen's Comp. Acts., p. 253.] ''Evidence that a gatekeeper was killed on the first night of his employment is not sufficient to establish that his employment was casual.'' [2 Schneider on W. C. A., p. 1801.] ''The burden of proving that the employment was *casual* is on the employer.'' (Italics ours.) [2 Schneider on W. C. A., p. 1868.] For this reason and others herein noted, the Commission could properly count Mr. Boand as a regular and not a casual employee.

It seems there were two corporations, the Shawnee Credit Corporation and the Sterling Finance Corporation. The stock of the latter was owned by the former. The officers of both were identical, and their lines of business were similar. Their businesses were carried on in the same offices. By reason of these facts the losses of the latter corporation were the losses of the former corporation. Sometimes the employee Boand was paid by the Shawnee Credit Corporation, and the employees of the two companies were interchanged as to services. ''The common law principle that an employee lent to a special employer, and who assents to the change, becomes a servant of the employer to whom he is loaned, applies to cases arising under the workman's compensation acts.'' [1 Schneider on W. C. A., sec. 24, p. 213.]

It cannot be said that the employment of the employees hereinbefore considered was not *incident* to the business of the employer. Considering the business of the employer, that of making loans on collateral paper, each and every one of them undoubtedly had a part in the operation of the business, or whose work was necessarily and directly incident thereto. Correct and comprehensive, as well as

*convenient,* records are important and necessary to the carrying on of this business, and it will not do to say that those engaged in perfecting and keeping these records in the proper condition were merely *casual* employees or were engaged in work *not* incidental to, nor a part of, the usual business of the employer.

We have carefully considered all of the objections made to the persons named in the list of sixteen claimed to make up the list of regular employees, regularly employed, and find that there are still more than ten of that number. Hence, there being substantial evidence to support that claim, we cannot disturb the Commission's finding in that regard.

Did the accident arise *out of* and *in the course of* the deceased's employment? As to the latter, the evidence hereinbefore recited in considering the motion to dismiss, is ample to justify the Commission in so finding. [Wahlig v. Krennig-Schlaup Grocer Co., 29 S. W. (2d) 128, 130; Smith v. Levis-Zukoski Merc. Co., 14 S. W. (2d) 470; Jackson v. Euclid-Pine Inv. Co., 22 S. W. (2d) 851; Leilich v. Chevrolet Motor Car Co., 40 S. W. (2d) 601.]

As to whether the accident *arose out of the* employment there is this to say, in addition to what has been said in that part of this opinion passing on the motion to dismiss appeal:

The record discloses that police officer Crawford, who arrived shortly after the accident and found the car wrecked, the tree greatly damaged, and Barlow lying on the parking about eight or ten feet east of the car, testified that he did not have any conversation with him, but "heard him tell somebody, and I don't know who it was he was talking to, but I heard him make the remark he had spells come on him of blankness at times. He had been shell-shocked in the war and he would be all right in a few minutes. That is all I heard him say." Witness said that at that time he (Barlow) was in a "kind of semi-conscious condition like an injured person is."

Another witness, Lanshof, was on the south side of Fortieth Street about fifty feet east of Warwick, when he "saw *some cars* coming across Warwick at the rate of about forty-five miles an hour, and *it* weaved over to the north side of the street and barely missed a sedan driven west (Barlow as heretofore stated was going east on Fortieth) and then continued on down and weaved over to the south and ran into this tree. . . . The tree is slightly east of the middle of that block on the south side." At times witness was in such close proximity to the injured man lying there, that he could have heard anything he said, but not all the time, but he heard nothing while he was there. At the time he first saw the car it was slightly west of Warwick just entering the intersection, and it did not start weaving until it crossed Warwick, it "weaved north and then over to the south" and "almost side-swiped this car going up the hill" and then it zigzagged a little more and ran into the tree.

Witness was between forty and fifty feet west of the tree. He never *noticed the driver* until after the wreck, *nor did any other witness.*

Barlow's wife, the claimant, reached the hospital after he had been taken there. He appeared to be "suffering badly when I got there." . . . "I believe he was unconscious. He talked to me afterwards." "He was disfigured and he was all wrapped up to his chin and one hand."

"Q. Did Mr. Barlow regain consciousness? A. He did for a few minutes but that is all. He could see me and he seemed to know what I said to him, but he did not talk to me only shortly after they put him to bed.

"Q. What was the course of that conversation? A. I said to him, I said, 'Lloyd do you know I am here,' I said, 'I am Ruth,' and he said, 'yes' and he said, 'did they get that fellow' and I said, 'What fellow,' and he said, 'I don't know what fellow' and he said he either turned out to keep from hitting a man or to keep a man from hitting him, I don't know which, and just to pacify him and keep him quiet, I said, 'Yes, I guess they got him.' I did not know then how the accident happened.

"By Mr. Byers: If the Court please, I ask that that be stricken out as being based on hearsay; as being a self-serving declaration; as having no probative value as far as the issues herein are concerned.

"By the Referee: I am going to overrule that motion.

"By Mr. Byers: Exception.

"Q. Did he state anything further to you? A. He did not.

"Q. Did you have any further conversation with him? A. I did not.

"Q. Did you stay at the hospital that night? A. Not all night. I stayed until about nine or nine-thirty.

"Q. He still appeared in about the same condition when you left? A. Yes, sir, he did."

On cross-examination, witness testified that the attacks or fainting spells which deceased had at times, would last "just a few minutes" and "maybe he would have one a week or maybe he would not have one." This was in reference to times before the accident.

Mrs. Leonard, a witness for claimant, testified she was on the north side of Fortieth Street about halfway between Warwick and Hyde Park streets, walking east. There were two cars behind her when she first noticed them. They were going east the same way she was going. Mr. Barlow's car crashed into the tree. It was south of the other car, and the other man sped on across the street and stopped his car and came back. He asked someone to help him get the injured man out of the car and they did and laid him down, afterwards placing him on the parkway in the shade. He was unconscious. She *never heard him make any statement or say anything at all while he was there.* She said she "was right there on the ground."

"I don't think the man could talk. He kept doing, putting his hand up here (indicating) as if it hurt him terrible there." She said she heard the cars coming behind her. She said she did not know what caused her to turn around and look. She did not notice that the cars were "coming so fast," they seemed "medium" to her. She had never owned a car or driven one. They (the two cars) were side by side. She resumed her walk toward the east, and when she was just opposite the tree the cars caught up with her and Barlow's car hit the tree as she looked up. She did not look up in time to see it hit the tree.

Now, the evidence of Crawford hearing the injured man tell "somebody" he had been shell-shocked in the war and had fainting spells, does not expressly say that that is what caused the accident, but it appears on its face to be a statement concerning his theretofore unconscious condition and the reason for his certainty he would be all right in a few minutes. Besides, this evidence of Crawford is *contradicted* by Mrs. Leonard who says she was right there and did not hear him say anything but that he was unconscious and couldn't say anything. The truth, as between these two witnesses, was certainly a matter, or issue, of *fact*, for the Commission. The evidence of Crawford, if true, was not, in our opinion, hearsay and hence did not afford claimant any ground or excuse to introduce the evidence as to what the injured man said to his wife at the hospital.

Whether what Barlow said to his wife after he had been removed to the hospital, had had his injuries dressed and had been put to bed, was admissible under the rule of *res gestae,* is a matter which we seriously doubt. We have been cited to no case in Missouri holding that it is a part of *res gestae.* It is true, that it is sometimes held that where a person is injured and rendered unconscious, and afterwards, immediately upon regaining consciousness, spontaneously gives forth declarations as to how the accident happened, such will be regarded as a part of the *res gestae* even though a considerable time has elapsed since the happening of the injury. [22 C. J. 466.] Now, the evidence is not definite nor certain that Barlow had *continued to remain unconscious* throughout the period intervening between the injury and the talk at his bedside at the hospital. Indeed, Crawford said he was conscious at the place of the accident. It does not appear how long he had been conscious before his wife spoke to him. It is clear that he was *when* he did so, for she asked him if he knew her and he said yes. The expression "did they get that fellow" sounds like the spontaneous expression of a man returning to his senses, but as to the statement that he turned out to keep from hitting a man or to keep the man from hitting him, it is not shown at what period in the conversation it occurred, nor what was said to him to draw it forth. But, on the theory that it was *not* a part of the *res gestae* and therefore inadmissible as hearsay, did

not the request to strike it out as hearsay and self-serving, come too late? Counsel waited until after a *long* answer had been given by the witness, and even then made no *objection* but did request that it be stricken out. The preliminary questions, including the question calling for the conversation, indicated clearly the nature of the answer sought, and yet counsel for appellant sat still, making no objection until after the long answer had been given, concerning a conversation inquired about which could in no way be competent or relevant unless on the theory of *res gestae,* and then, when the statement of the injured man was found not to be what appellant desired, the request to strike out was made. It seems that this was too late. With this evidence remaining in the record unquestionably there was ample evidence from which the Commission could find that the accident arose *out of* his employment.

But even without this statement of the injured man, we think there was sufficient evidence to make it an *issue of fact* for the Commission to pass on. Mrs. Leonard's testimony shows a car coming alongside Barlow's car and a turning of his car out to one side and then his collision with the tree. The evidence elsewhere in the record is that another car was "coming up the hill" and, as Fortieth Street sloped to the east, this car was coming from the opposite direction to that in which Barlow was going. There was *no evidence whatever* of anyone who *saw* Barlow in the throes of one of his spells. And the only evidence tending to impliedly show that Barlow said he was, was directly *contradicted* by Mrs. Leonard who said he never became conscious at the place of the accident. If Barlow was in such an attack at the time, doubtless his accident arose out of or because of that, and not out of his employment. And while the burden of proof was on claimant to produce evidence sufficient to make a prima facie case and thereby enable the Commission to find in her favor, nevertheless, when she had done so, the burden of *going forward with the evidence* to show that deceased was in one of his spells at the time, or that the accident was caused thereby, was then on defendant, and this it failed to do. This, we think, conforms to and is not in conflict with the announcement made in Minton v. Driemaier S. & M. Co., 22 S. W. (2d) 61, 63, that . . . "the burden is on the claimant to establish that the injury was the result of an accident arising out of and in the course of the employment . . ." The same case, at the page cited also notes the "rule that, when hearsay evidence or self-serving declarations are offered, a proper objection must be made thereto, for if the evidence is admitted without objection, it is to be considered and given its natural and probative effect as if it were in law admissible. [Diaz v. United States, 223 U. S. 442, 32 S. Ct. 250, 56 L. Ed. 500, Ann. Cas. 1913C, 1128.]"

In what has been said hereinbefore, in analyzing the evidence. we do not want to be understood as even attempting to pass on the

weight or credibility of the evidence, but it was thus analyzed only to show what might very well be the view taken of it by the Commission, and that for this reason there is no substance to the contention that the Commission was without *any* substantial evidence to support its finding. The evidence necessary to support that finding created *issues* of *fact* and the Commission's findings are therefore conclusive upon the court. It follows that the decision of the learned trial judge affirming the award of the Commission, must be, and is itself hereby, affirmed. All concur.