THOMAS GARNANT, RESPONDENT, v. SHELL PETROLEUM CORP., APPEL-LANT.—65 S. W. (2d) 1052.

Kansas City Court of Appeals. November 6, 1933.

*Elton T. Harris* and *Randolph & Randolph* for respondent.

*Thompson, Mitchell, Thompson & Young, Charles H. Wagner* and *Malcolm E. Grant* for appellant.

SHAIN, P. J.—This case originated before the Workmen's Compensation Commission. A final award was obtained from two members, one member dissenting. The cause was appealed to the Circuit Court and the award of the Commission was there affirmed. From the judgment of the circuit court, the defendant has duly prosecuted its appeal to this court.

The facts as gathered from the record show that prior to and on June 11, 1930, one Cleo Runnels owned a building and some equipment commonly designated as a filling station. On June 11, 1930, Runnels and his wife, Ruth E. Runnels, executed a lease of said premises to the Shell Petroleum Corporation, a Virginia corporation, the defendant herein. Said lease was accepted and the same attested by A. S. N. Payne, regional manager for defendant. The

consideration in said lease was, that as rent for said premises, defendant was to pay lessors one-half cent per gallon on all gasoline sold. Defendant further convenanted to operate said station in a business-like manner and endeavor to promote and increase the sale of gasoline at said station.

The equipment referred to in the lease is shown to consist of items shown by inventory marked Exhibit A, which is in words and figures as follows:

## "Exhibit 'A'

"1—12'x12' Frame Building with 14 ft. canopy thereon.
"1—Hobart Air Compressor with 16 gallon Tank—with Attachments.
"2—C-615 10 Gal. Hand Lift Wayne Visible Pumps.
"2—550 Gal. #12 G. A. Galv. Under Ground Tanks."

On August 1, 1930, the defendant entered into a contract with Cleo Runnels to run and operate the filling station leased as above set forth.

This contract of employment is so germane to the issues presented in this case that we here set the same out in full as follows:

## "Contract.

"1. This Agreement, made and entered into this 1st day of Aug., 1930, by and between Shell Petroleum Corporation, a corporation with its principal office in the City of St. Louis, Missouri, herein designated as First Party, and Cleo Runnels, of the County of Davies, State of Missouri, herein designated as Second Party.

"Witnesseth:

"2. First Party does hereby employ Second Party to superintend and operate its service station for the sale of gasoline and other petroleum products, commercially known as Shell Products, upon the following described premises in the City of Cameron, County of Clinton, and State of Missouri, to-wit:

"One Frame Building 12 ft. x 12 ft. with 14 ft. canopy thereon with ingress and egress to light, water, heat and driveway situated on that part of E. G. Kerns property adjoining U. S. Highway No. 36 on the South and West side of said highway described as follows: Beginning at the Southeast corner of said tract running thence West one Hundred (100) feet, thence North to Highway right of way, thence Southeast along said Highway right of way to place of beginning, all in the E½ of the NE¼ of Section 23, Township 57, Range 30.

"Said employment to continue so long as Second Party complies with the terms and conditions herein set forth.

"3. Second Party agrees during the term of his employment to

handle, deal in, advertise and dispense only the petroleum products of First Party, and that he will not sell or deal in petroleum products of any other manufacturer, jobber or agent.

"4. Second Party is given the right to handle and deal in automobile accessories in his own name, in his own behalf and on his personal account, but not in the name or in behalf of First Party. Provided, however, that the exercise of said right shall not interfere with the proper operation of said filling station, its appearance, or with any advertising incident to the sale of Shell Products.

"5. Second Party agrees that he will operate said filling station in compliance with the rules, regulations and directions of First Party and in a manner satisfactory to First Party, of which First Party shall be the sole judge.

"6. Second Party agrees that he will sell only Shell Petroleum products from said filling station and only for cash, unless specific permission is granted by First Party to extend credit and that any credit sales made without such specific permission will be for his account alone; that he will not purchase supplies or equipment on credit of First Party; that he will devote his entire time and best efforts to the promotion of sales of said Shell Products from said station.

"7. Second Party agrees to sell and dispense gasoline and other petroleum products from said station furnished him by First Party, at prices named by First Party from time to time, and agrees that he will not sell below the prices so named.

"8. Second Party agrees in the event he should desire to resign or cease said employment that he will give thirty (30) days' notice in writing to First Party of his intention so to do.

"9. It is understood that if First Party holds the premises above described under a lease that this contract shall end and terminate with the termination of said lease for any cause.

"10. Second Party further agrees whenever Shell gasoline is delivered to him to deposit with First Party a sum of money equal to the sales price thereof, less his commissions provided for herein, and whenever other petroleum products are delivered to him to deposit with First Party, in cash, the price of said products established by First Party in said community, less the discounts then prevailing at such place. First Party may grant time for the payment of such products, but in such case Second Party agrees to pay for same within the time specified.

"11. First Party, during the term of employment of Second Party, agrees to pay Second Party a commission on all gasoline delivered at said filling station of three (3c) cents per gallon, the same to be deducted from resale price as provided above. On all lubricating oils and greases delivered at said filling station during said term First Party agrees to allow the discounts from list or retail price

current at such place and time on the quantity delivered as set forth in First Party's Lubricating Oil Quantity Discount Agreement, a copy of·which is attached hereto and marked exhibit 'B.'

"12. Second Party agrees that during the term of his employment under this contract he will be responsible for and will pay all the current expenses incident to the operation of said filling station and that he will replace at his own cost all or any portion of the property, equipment or appliances loaned or supplied to him by First Party for the proper operation of said Filling station which may be lost, stolen, destroyed, broken or damaged through no fault of the First Party; and said replacement shall be by property of equal value; loss occasioned by normal wear or tear only excepted.

"13. Second Party further agrees that he has read the list of such equipment and appliances attached hereto (marked Exhibit A) and hereby acknowledges receipt and possession of the items listed therein.

"14. Second Party does agree to hold First Party harmless for any and all claims, damages, or loss of whatsoever kind or character which may arise, or are occasioned by the operation of said station, whether said loss or damage is sustained by the Second ·Party, his agents, employees or persons other than the parties to this contract, or the property of either of said parties.

"15. First Party agrees to refund to Second Party, in the event this contract is terminated by either party under its provisions, the amount paid to First Party for gasoline or other petroleum products unsold and on hand at such time.

"16. It is the understanding that after petroleum products are delivered to Second Party that said Second Party assumes all responsibility for loss or damage to same by reason of leakage, fire, theft, flood, the acts of God, or unaccountable or unexplained losses.

"In Witness Whereof, the parties hereto have executed this instrument the day and year first above written.

"SHELL PETROLEUM CORPORATION
"By H. C. HALL
"(Seal)
"CLEO RUNNELS .

"Witness:
"H. J. SCHUKUT.
"Exhibit 'A'
"2 Shell Pump Globes and 2 Super Shell Pump Globes
"4—30 Gal. Bennett Hi-Boys Lube Cabinets
"1—65 Gal. Bennett Kerosene Cabinet
"2—42 Inch Lighted Signs and Standards
"This cancels any previous contract of employment.
"CLEO RUNNELS."

The evidence discloses that Cleo Runnels, in place of individually running the station in question, hired his nephew one George Pittman as his agent to operate the station. It appears from the evidence that Runnels came around, generally on Mondays, to check up with Pittman. Runnels testified that while Pittman was his agent with full power and control to run and operate the station, that still he never gave Pittman any right to hire anybody; that although the hours were long he expected Pittman to stay there and that he expected his wife to take him his lunch. Runnels testified that he had instructed Pittman to keep the station open from six (6) to nine (9) a period of fifteen hours.

It was shown by the evidence that Pittman employed the claimant as a relief man at the station and that claimant received one dollar if half day or less and two dollars if over one-half day and it was shown that claimant was paid from the cash drawer where the money for sales was placed.

It was shown that when claimant was working at the station he was in full charge, that he sold nothing but shell products, that he sold gas and that while he was in charge gas from the defendant was delivered into the tanks. Claimant testified that agents and employees of defendant were at the station at times when he was in charge. The claimant further testified Runnels knew that he was working at the station and that Runnels said it was all right. Runnels testified that he had heard claimant was working at the station but that he had not personal knowledge and he denies that claimant ever told him he was working there and denies that he in any manner acquiesced in said employment. There is evidence to the effect that claimant was on the job as often as fourteen days in a month.

Claimant testified that at from seven to seven-thirty in the evening of October 16, 1930, he was at the station and in full charge thereof when a bandit opened the door, stuck his gun in and shot him down.

There is evidence *pro* and *con* as to the safe or unsafe condition, and as to it being suitable as to location and lights for a hold up. However, it was disclosed that there was a hold up and that defendant was shot by the bandit in the right arm, breaking and shattering the bone thereof.

The claimant's claim is based upon the above accident.

It appears in evidence that Runnels at about 10 A. M. of October 16, 1930, had called claimant requesting him to go and watch the station that night. It appears there had been an attempt by someone to break into the station the night before.

The following findings of facts by the Commission are challenged:

"4. Was above employe in employ of above employer at time of accident? Yes.

"5. Did accident arise out of and in the course of the employment? Yes."

262

The award of the Commission was as follows:

"Compensation Due.

"21. Value necessary medical aid not furnished by employer or insurer ...................... $250.00

"22. Amount of compensation due: 58 weeks at $8.00 per week ............................... 464.00

Total ............... $714.00

"23. Paid to date by employer or insurer ............ None

"24. Balance due employee .................... $714.00

"28. Dated September 24th.

"Jay J. James,
"Member, Missouri Workmen's Compensation Commission.

"Seal)

"Wm. T. Findly,
"Secretary of said Commission."

The circuit court having sustained the Commission's award the defendant in its appeal is urging the following assignment of error:

"I.

"It was error to hold Thomas Garnant was an employee of Shell Petroleum Corporation actually or by implication. He was never legally proved to be such; a careful reading of the abstract will so show. Since he was not an employee he cannot recover.

"II.

"It was error to hold Thomas Garnant was a regular employee. He was a casual employee if any. No liability for injuries to casual employees exists under the Compensation Act.

"III.

"It was error to hold Shell Petroleum Corporation was liable for compensation at the rate of $8.00 per week. At most, it was liable at the minimum of $6.00 per week.

"IV.

"It was error to hold Shell Petroleum Corporation liable for compensation because it was not notified of the accident within thirty days to its prejudice.

"V.

"It was error to hold Shell Petroleum Corporation liable for medical services because the claimant selected his own doctor and hospital."

As to whether or not the finding of the Commission, that claimant was an employee of defendant at the time of the accident or that the finding was sustained by any competent evidence, presents the first question for this court's consideration. The findings of fact by the commission must be considered by us under the rules applicable to findings of fact by a jury, and no authority need be cited to the effect, that if there is any evidence supporting their finding, then we have no right to set the commission's finding of fact aside.

In determining the first question presented, we must of course be guided by the definitions as to employer and employee as found in the Workmen's Compensation Act. Section 3304 of the act is as follows:

"(a) Every person, partnership, association, corporation, trustee, receiver, the legal representatives of a deceased employer, and every other person, including any person or corporation operating a railroad and any public service corporation, using the service of another for pay."

Section 3305 of the act is as follows:

"(c) Without otherwise affecting either the meaning or interpretation of the abridged clause, 'personal injuries arising out of and in the course of such employment,' it is hereby declared not to cover workmen except while engaged in, or about the premises where their duties are being performed, or where their services require their presence as a part of such services."

There is no escaping the conclusion that the defendant was operating the filling station at the place of the accident by and through its agent Runnels who was given the duty to superintend and operate its service station. The contract in the fifth paragraph thereof provides that operation by the agent must be in compliance with the rules and regulations of defendant of which defendant was to be the sole judge.

True, it is, that defendant by the fourteenth paragraph of the contract of employment attempts to absolve itself from any and all liability for damages arising from the operation of the station. However, we conclude that such provision was as fruitless as would be an attempt of a common carrier to avoid the consequences of the acts of its agents and employees while engaged in service of operation.

The meat of the cocoanut here presented, is as to whether or not the act of Pittman, the man put in charge of the station by defendant's agent Runnels, by hiring help to operate the defendant's station would so bind the defendant as to make that help an employee of defendant had full knowledge and had. acquiesced in the operation stances in evidence concerning the operation of the station must be considered.

As to the operation of the service station it was shown that Runnels never attempted personally to operate the station. From the

evidence the triers of the fact could infer and concluded that the defendant had full knowledge and had acquiesced in the operation of the station by Pittman, with the knowledge that Runnels was not attempting personally to operate the same. The triers of the fact we conclude had the right to use common horse sense and give consideration as to whether or not the requirements of fifteen consecutive hours service was or was not a one man's job. There was evidence from which the triers of the fact could conclude, that both Runnels, defendant's agent, and other agents and employees of defendant well knew that Pittman in the operation of the station was at times turning over the entire operation of the station to the claimant herein. The fact that Pittman employed claimant is clearly shown.

The triers of the fact were further justified in giving consideration of the fact that defendant's agent, Runnels, called the claimant for service on the very day of the accident, this fact alone however, but primarily goes to the issue of casual employment, however it was a circumstance to be considered in connection with other facts and circumstances in determining the issues herein.

In coming to a conclusion on the issue before us, there arises the application of the principle involved in the question as to whether or not an agent is acting within the scope or apparent scope of his authority. Germane to the above, we quote from the opinion in Lorie v. Lumbermen's Mut. Cas. Co., 8 S. W. (2d) 81, 84, as follows:

"It is well settled that it may be inferred from a course of dealing or practice between the principal and agent, or one acting as his agent, that the principal has conferred certain authority upon the agent. In such a case, where the rights of either party are involved, an agreement conferring such authority upon the agent will be implied by the conduct of the parties, even though the express agreement between the parties does not confer authority to perform the act in question on the part of the agent, or in fact, where such act is expressly prohibited by the original contract of employment. This holding is not upon the theory of estoppel, but upon the theory that there has come into existence an implied contract between the principal and agent giving the agent authority to perform the act."

There is nothing in this case from which we can presume that the defendant was not exercising all of its rights under the provision of its contract of employment with Runnels. The triers of the fact had the right to assume that all that was being done in the necessary operation of the service station was in *compliance with the rules, regulations and directions* of the defendant that had reserved to itself the right to be the sole judge thereof.

Based upon the above premises, conclusions and declarations of law, we conclude that there was shown evidence to support the Workmen's Compensation Commission in its finding of fact to the effects

that claimant was an employee of defendant at the time of the accident and that the accident arose out of and in the course of the employment.

The question of whether the claimant was or was not a casual employee becomes pertinent. Under the English rule the issue of casual employment is determined by the nature of the service rendered, while under the American rule the contract of employment must be analyzed in order to determine.

In an opinion by TRIMBLE, P. J., 48 S. W. (2d) 35, 51, it is held that employment within the meaning of the Workmen's Compensation Act is not casual merely because it is not for any specified time and the opinion in that case further holds that the burden is upon the employer to prove that the employment was casual.

It has been repeatedly held by the courts of states having similar Workmen's Compensation laws to ours, that employment is not casual where one is employed to do a particular part of the service recurring somewhat regular with fair expectation of continuance for a reasonable period. [Sabella v. Brazilerio, 86 N. J. L. 505, 91 Atl. 1032; Howards Case, 218 Mass. 404, 105 N. E. 636; Dyer v. James Black Masonry & Constructing Co., 192 Mich. 400, 410.]

The occurring frequency of claimant's employment, as often as fourteen days in a month, the absence of any fact or circumstance in evidence from which it might be concluded the employment might not have the expectancy of continuance for a reasonable time and the fact that the nature of his contract was such that while employed the full duty of operation devolved upon claimant, all negative casual employment. We therefore conclude that the claimant was not a mere casual employee.

We conclude that the Commission was justified under the provisions of Section 3320 of Revised Statutes 1919, in making the award in the amount shown in the Commission's "Compensation Due."

As to the question of notice of the accident, it was shown that defendant's agents and employees knew of the accident on the day same occurred. The fact that defendant's agents Runnels ordered claimant on the job the day of the injury, the publicity of a hold up of defendant's service station, in fact all of the facts and circumstances in evidence concerning the injury and the nature thereof are sufficient to show that any want of formal notice worked no prejudice to defendant.

As to defendant's liability for medical services—the defendant through its agents had knowledge that defendant had received a serious gun shot wound at a time when he was in charge of its station by the direct order of its agent. No complaint is made that the injury has been augmented by any refusal on the part of the claimant to submit to medical or surgical treatment. For the defendant to stand idly by and not offer to furnish medical or surgical service to a man

who was shot down by a robber while he was in charge of its service station presents a poor premises for the fifth presentation of error made in defendant's brief.

Based upon foregoing premises and conclusions, the judgment of the circuit court in sustaining the finding of facts and award made by the Workmen's Compensation Commission in this case is affirmed. All concur.