ARKANSAS FUEL OIL COMPANY *v.* SCALETTA.

4-5890                                    140 S. W. 2d 684

Opinion delivered May 13, 1940.

*Martin, Wootton & Martin* and *Buzbee, Harrison, Buzbee & Wright,* for appellants.

*Jay M. Rowland, Richard M. Ryan, Leo P. Mc-Laughlin* and *Earl J. Lane,* for appellees.

GRIFFIN SMITH, C. J.  Gladys Watts, Jayme Bright, and Doris Ann Scaletta [1] each recovered judgment for $3,000 to compensate personal injuries sustained in an automobile collision.  When the court overruled the defendant's motion for a new trial it reduced to $568 the judgment in favor of Gladys Watts, and to $500 the judgment in favor of Jayme Bright.

The appeal is from the court's action in accepting the jury's findings that Homer Smith was a servant of Arkansas Fuel Oil Company; that Charles Lewis, at the time the collision occurred, was engaged in business pertaining to operation of the filling station leased by Homer Smith, and that statements made by Lewis to the effect that he had delivered five gallons of gasoline to a customer and was returning to the station when the collision occurred were admissible as testimony tending to establish the fact of Smith's agency.

August 12, 1938, Homer Smith entered into written contract with Arkansas Fuel Oil Company to handle its products.  He agreed ".  .  .  to purchase and receive quantities of products covered by this contract, as ordered [by Smith] from time to time, at the prevailing prices in effect for merchandise ordered [by Smith] as published or announced by seller, at the time and place of delivery."

Arkansas Fuel Oil Company reserved the right to make price changes without prior notice.  There was an agreement that Smith would not return for exchange or credit any merchandise unless expressly authorized. Smith's obligation was to pay cash when deliveries were made, unless other arrangements were entered into.  The oil company agreed to accept, in lieu of cash, amounts purchased by customers to whom it had issued credit cards. [2]

---

[1] Doris Ann Scaletta, a minor, sued by Mrs. H. H. Watts, her grandmother, as next friend.

[2] "The seller agrees that it will accept, in lieu of cash for products and merchandise purchased hereunder, assignment of charges against customers of seller on its approved credit list as furnished to buyer from time to time by seller's credit manager.  The privilege granted to buyer by the provisions of the paragraph is limited to debts of seller's approved customers for petroleum products which shall have been purchased for resale by buyer from seller, and which are represented by invoices, signed by the particular customer, on forms furnished or approved by seller, and which shall be assigned to seller in a manner satisfactory to seller's credit manager."

Life of the contract was one year, ". . . provided, however, that the buyer may terminate this agreement upon the expiration of any yearly period by at least 30 days prior written notice to seller; and seller may at any time terminate same by giving to buyer written notice of such intention ten days prior to the effective date thereof."

The eighth provision of the contract is: "Seller, in its uncontrolled discretion, may at any time change the brand-name or any distinctive designation of any of its products. Should it do so, this contract shall be deemed to cover products of the new name or designation to the same extent as if said name or designation were specifically set forth herein."

By section 9 the buyer agrees to pay seller amounts equivalent to any tax or duty not included in the price or otherwise paid by buyer, subsequently imposed ". . . by any domestic or foreign governmental authority or agency," and buyer's obligation is to reimburse seller for such payments.

Section 11, shown in the footnote,[3] is emphasized by appellees as explanatory of the relationship between buyer and seller.

The agreement from which excerpts have been taken is designated "Authorized Dealer Contract." Another writing, executed August 12, 1938, is styled "Contract of Lease." It identifies Arkansas Fuel Oil Company as a West Virginia corporation, called the lessor, and Homer Smith as lessee. After describing the property, a one-year term is expressed, with the right by either party to terminate the contract ". . . at any time either before or after the expiration of said fixed term by giving not less than ten days' prior written notice." Other provisions appear in the fourth footnote.[4]

---

[3] The buyer agrees that no suit for damages under this agreement against the seller, based on any anti-trust law of the United States, including the Robinson-Patman Act (Public No. 692 74th Congress H. R. 8442), or under any anti-trust law of any state, or any amendment of said laws shall be valid unless instituted by legal process within six months of the date of the matter or transaction complained of.

[4] "The lessee agrees to pay the lessor, as rental for said premises during the term of this lease: one cent per gallon on each and every gallon of motor fuel sold at the above premises, said rental to be paid not later than the expiration of

Modification of the foregoing contract was made January 17, 1939, to the extent that the fixed rental charge was reduced to $20 from $30 per month.

Smith testified that when the amount of gasoline sold in any month was less than 3,000 gallons, he paid the rental difference.

Counsel for appellees say: "The Arkansas Fuel Oil Company is trying to hide behind several written instruments, . . . which are subterfuges, in order to conduct its business without being held responsible for the negligent act of its servants." Authorities cited by appellees in support of this contention are *Gulf Refining Company* v. *Brown*, 93 Fed. 2d 870, 116 A. L. R. 449, *Caddo River Lumber Company* v. *Holmes,* 199 Ark. 417, 133 S. W. 2d 884, and other cases shown in the fifth footnote.[5]

Smith testified to operating the service station under the lease. Gasoline and oil were delivered. Smith purchased some of the station personal property from Roy

the month in which sale shall be made; and for the mutual convenience of the parties, it is agreed that as to motor fuel purchased for resale from lessor and delivered to the above premises, one cent per gallon shall be added to the price otherwise paid by lessee to lessor as and for the rental in respect thereof; provided that the minimum rental for said premises shall be $30 per month from the effective date of this lease.

"If the rentals collected during the current month do not amount to the minimum rent, lessee shall pay the difference in cash at the end of the month. . . .

"That said premises will be used only for the operation of a gasoline service station and for the storage and sale of petroleum products and such other products as are customarily sold at gasoline service stations. The lessee will make no alterations, additions, or changes in said buildings or equipment located on said premises without first obtaining written consent of the lessor. The lessee further agrees to pay all gas, electric charges, water rentals, license fees, taxes and other charges accruing in connection with the use and operation of said premises; to keep said premises, buildings, driveways and approaches in good condition and repair; to keep such premises and sidewalks clean, and comply with any and all laws or ordinances or rules or regulations thereto. . . .

"Lessee agrees to exonerate, save harmless, protect and indemnify the lessor from and against any and all losses, damages, claims, suits or actions, judgments and costs which may arise or grow out of any injury to, or death of persons or damage to property in any manner connected with the use and possession of said premises by the lessee, or the use, maintenance and operation of any business conducted by the lessee on said premises. This contract is personal to the lessee and the premises shall not be sub-let or this contract assigned."

[5] *Magnolia Petroleum Co.* v. *Johnson*, 149. Ark. 553, 233 S. W. 680; *Ice Service Co.* v. *Forbess*, 180 Ark. 253, 21 S. W. 2d 441; *Terry Dairy Co.* v. *Parker*, 144 Ark. 401, 223 S. W. 6; *Collison* v. *Curtner*, 141 Ark. 122, 216 S. W. 1059; 8 A. L. R. 760; *Gulf Refining Co.* v. *Rogers*, (Texas) 57 S. W. 2d 183; *Joiner* v. *Sinclair Refining Co.*, 48 Ga. App. 365, 172 S. E. 754; *Greene* v. *Spinnig*, (Missouri), 48 S. W. 2d 51; *Coffman* v. *Shell Petroleum Corp.*, 228 Mo. App. 727, 71 S. W. 2d 97; *Garnant* v. *Shell Petroleum Corp.*, (Missouri), 228 Mo. App. 256, 65 S. W. 2d 1052; *Buck* v. *Standard Oil Company*, 224 App. Div. 299, 230 N. Y. S. 192.

Cox,[6] but did not know what he paid for it—paid cash in monthly installments. Arkansas Fuel Oil Company owns the station buildings which were on leased land. Witness owned gasoline, oil, and accessories. Arkansas Fuel Oil Company owned the pumps, greasing rack, etc. Customer credit cards issued by Arkansas Fuel Oil Company were honored. Arkansas Fuel Oil Company supplied receipts for use in connection with credit cards, but did not furnish stationery, or other items, such as soap, etc.

Smith evidenced by his testimony that he was not familiar with the contract. He stated that he did not read it at the time it was executed.

In appellees' brief there is this statement: "The 'Contract of Lease' itself presented a sufficient question for the jury as to whether appellant, Homer Smith, was an independent contractor or agent. But that was only the beginning. The next written instrument which was an 'Authorized Dealer Contract,' proved conclusively that Homer Smith was an agent."

We do not agree that a jury question was presented by the contracts. These were for the court to construe. Conduct in respect of the manner in which the contracts were treated, or attitude of the parties regarding the sub-ject-matter—that is, sale of appellant's products—was for the jury.

The three propositions argued by appellees in support of the judgments are: (1) Was Homer Smith an agent of appellant, or an independent contractor? (2) Conceding that Smith was an agent of Arkansas Fuel Oil Company, was Charles Lewis acting within the scope of his employment at the time of the accident? (3) If Smith was an agent, and Lewis was acting within the scope of his employment at the time of the collision, does the fact that Lewis was employed by Smith, and not by appellant, relieve appellant of liability by reason of the negligence of Lewis?

There was introduced in evidence a third contract (consignment agreement) relating to tires and batteries.

[6] Cox was retail distributor for Arkansas Fuel Oil Company.

It was signed May 2, 1939—more than three months after the causes of action herein arose. Unexplained, and not connected with the other contracts, it has no evidential value.

The automobile driven by Lewis when the collision occurred was owned by Smith, as attested by certificate issued by the state department of motor vehicle registration. Smith testified: "I employed Lewis and paid him. I had the right to hire and fire him and no one other than myself exercised any control over his actions. At the time I bought the inventory and took the lease, I took out an occupation tax. I took out an occupation tax for 1939, and I was operating under authority of the tax January 10, 1939. I arranged for my own utilities. I made arrangements for my own telephone and it is listed in my name—'Homer Smith's Service Station', 1301 Central, telephone No. 3319. . . . If I make a profit on the station it is my profit, and if I take a loss on it, it is my loss."

A card in the classified section of the Hot Springs Telephone Directory under "Cities Service and Loreco Products" advertises gasoline, motor oil, Acme tires and batteries, followed by "Where to Buy It—Smith, Homer Service Station."

If Smith was an independent operator and not an agent or servant of the oil company, the latter is not accountable for his negligence.

There was testimony that the negro, Lewis, when the collision occurred, had been sent to inform Mrs. Smith that her mother was ill. Mrs. Smith testified that the message came to the filling station and was brought to her by Lewis. Her mother lived at Murfreesboro, and died some time later. The collision occurred while Lewis was returning to the station from delivering the message,[7] according to contentions of appellants.

---

[7] Monroe Young, police officer, testified to statements made by Lewis at the filling station after the accident. Walter Thompson, another police officer, testified to statements he says Lewis made in municipal court building, as did three other witnesses. Because the case turns on another question, we pretermit discussion of the admissibility of this testimony. It was used to establish the contention that Lewis was on business for the filling station when the collision occurred, as distinguished from a private mission for Smith.

What were the contractual elements creating between Smith and the oil company the relationship of master and servant?

As enumerated by appellees they were: (1) Retention by the oil company of the right, on ten days' notice, to terminate the dealer's contract. (2) Although the oil company furnished Smith with gasoline and oil pumps and tanks, grease gun, air compressor, greasing and washing rack, "and other incidentals that go with the operation of a service station," Smith was "restricted to use the premises only for the operation of a gasoline service station and for storage and sale of petroleum and such other products as are customarily sold at gasoline service stations." (3) Smith was prohibited from "making any alterations, additions, or changes in the building or equipment . . . without first obtaining written consent of the lessor." (4) Smith was to pay "all gas and electric bills, water rentals, license fees, taxes, and other charges accruing" in connection with operation of the station. (5) He was to "keep the premises, buildings, driveways and approaches in good condition and repair, to keep such premises and sidewalks clean, and comply with any and all laws or ordinances or rules or regulations thereto." (6) He agreed to "exonerate, save harmless, and protect and indemnify [the oil company] against any and all losses, damages, claims, suits, or actions, judgments and costs which may arise or grow out of any injury to, or death of persons or damage to property in any manner connected with use and possession of the premises." (7) The amount paid as rental (originally $30 per month, then reduced to $20) was less than the amount paid by the oil company as lease charges on the land upon which the station buildings were erected. (8) Smith agreed to buy Loreco products, and that the company might change the name of its commodities without impairing rights under the contract. (9) Forms upon which charges were made to credit-card customers were supplied by the oil company.

We cannot agree with appellees that the so-called restrictions had anything to do with the means or methods by which the filling station was operated. In *Moore and Chicago Mill & Lumber Co.* v. *Phillips,* 197 Ark. 131, 120 S. W. 2d 722, it was said in a headnote: "If there is nothing in the contract showing an intent upon the part of the employer to retain control or direction of the means or methods by which the party claiming to be independent shall perform the work, and no direction relating to the physical conduct of the contractor or his employees in the execution of the work, the relation of independent contractor is created. The governing distinction is that if control of the work reserved by the employer is control not only of the result, but also of the means and manner of the performance, then the relation of master and servant necessarily follows. But if control of the means be lacking, and the employer does not undertake to direct the manner in which the employee shall work in the discharge of his duties, then the relation of independent contractor exists."

It was then said (fourth headnote) that "Even though the contract itself creates the relation of employer and independent contractor, such relationship may be destroyed by conduct of the employer through direction of the means and methods of producing physical results; and this is a question of fact for the jury if there is substantial evidence to show that such conduct became operative."

Appellees rely chiefly upon *Gulf Refining Company* v. *Brown,*[8] *supra,* in support of their belief that control of the means and method of operating the filling station was retained by the oil company. They insist this is evident from the contracts. No conduct of a substantial nature subsequent to execution of the agreements pointed to is sufficient to show that the oil company was, in fact, operating the station through Smith. The only circumstance is Smith's admssions on cross-examination that he was not familiar with terms of the contracts. Even so, he did know what his payments were, and he bought

---

[8] 93 Fed. 2d 870, 116 A. L. R. 449.

and sold gasoline, oils, and handled other filling station supplies.

In the Brown Case the so-called independent contractor (Ford) did business under a consignment contract by the terms of which he made deliveries in trucks bearing the insignia of Gulf Refining Company. The Gulf Refining Company fixed the price Ford was compelled to charge the customers, and required daily remittances. The accident in the Brown Case was traceable to an error in delivering kerosene containing gasoline. An explosion occurred when the customer undertook to kindle a fire. The commodity delivered by Ford was property of Gulf Refining Company—a fact which clearly distinguishes that case from the instant appeal.

We know of no rule of law or judicial construction preventing the owner of property from renting or leasing it under restrictions requiring upkeep, prohibiting alterations in or additions to the buildings, and providing for return of the property at the end of the term in the condition it was received, "ordinary wear and tear excepted."

Nor does the fact that the oil company retained the right to terminate the sales contract on ten days' notice tend to convert it into a contract of agency. It is true the oil company retained advantages not accorded Smith, but courts do not make contracts, and the fact that a person or corporation proposes and executes an agreement containing inequitable provisions is a matter which addresses itself to the parties rather than to the judiciary, unless public policy is impaired.

Use of the credit cards was an advantage to Smith. That the oil company's business was also served is not a circumstance changing the relationship of buyer and seller. It is a common practice of oil companies to issue credit cards. They select approved risks and supply dealers with a list of those to whom cards have been issued. The customer presents the card and buys gas, oil, or other permissive requirements, and signs a ticket for the amount. The filling station operator, in turn, delivers such tickets to the oil company and receives

credit on his own purchases, or collects the amount in cash or its equivalent. In effect, the filling station operator assigns these charge tickets to the oil company—a privilege granted under the contract.

It is strongly urged that the agreement by Smith to hold the oil company harmless against damages evidences what appellees say is the true relationship—that of master and servant, or principal and agent. In the circumstances of this case we think the provision nugatory. It is a fair example of writing into a contract something that had no place in it.

There is little doubt that at times contracts somewhat similar to those in the instant appeal are executed as "cover-up" agreements, and that they are sometimes used, as counsel for appellees say, as a subterfuge to hide the true relationship. Where there is evidence such has been done, a question of fact for the jury is presented. Here, however, appellees have not shown, except by supposition, that Smith did not, in good faith, lease the property in question. His automobile was being used by Lewis when the collision occurred. He bought his supplies. There is nothing substantial contradictory of his testimony:—"If I make a profit on the station it is my profit, and if I take a loss on it, it is my loss."

With the record in this condition the trial court should have instructed a verdict for Arkansas Fuel Oil Company. The situation is different with Smith. Whether Lewis had been sent to deliver gasoline, or to convey a private message, the mission was undertaken at his instance, and Lewis was his servant.

As to Arkansas Fuel Oil Company, the judgments are reversed and the causes dismissed. As to Smith, they are affirmed.