Walter Elbers, Appellee, v. Standard Oil Company, Appellant.   Albert Fraser, Defendant.

Gen. No. 43,771.

208

KILEY, J., specially concurring.

Opinion filed May 7, 1947. Released for publication May 22, 1947.

HUBBARD, BAKER & RICE, of Chicago, for appellant; ALVIN GLEN HUBBARD and RUSSELL BAKER, both of Chicago, of counsel.

AUGUSTINE J. BOWE, WILLIAM J. BOWE and JOHN D. CASEY, all of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

Walter Elbers filed an amended complaint in the superior court of Cook county against Albert Fraser and Standard Oil Company of Indiana to recover for injuries suffered on May 30, 1944, when an automobile lift fell upon him. A trial before the court and a jury resulted in verdicts finding Fraser not guilty and the corporation guilty, and assessing damages at $100,000. Motions by the corporation for a directed verdict, for judgment notwithstanding the verdict, for a new trial and in arrest of judgment were denied. Judgments were entered on the verdict in favor of plaintiff and against the corporate defendant and for the individual defendant and against plaintiff. The corporate defendant appealed. No cross-appeal has been filed by plaintiff to reverse the judgment in favor of the individual defendant. As there is only one defendant in this court, we will refer to the corporate defendant as the defendant.

On Memorial Day, Tuesday, May 30, 1944 plaintiff drove his 1937 Chevrolet automobile from his home to the filling station at the northwest corner of Ellis avenue and 31st street, Chicago, for the purpose of mending a tire, having the oil in his car changed and having the car greased. He lived on the far south side. The filling station was just off the Outer Drive at 31st

street in a direct line of travel from his home to his place of employment. Fraser took possession of the station and equipment on August 16, 1938. He had possession of the station and equipment by successive leases from defendant from then and was in possession at the time of the trial. Plaintiff maintains that notwithstanding the leases, the evidence shows that defendant continuously controlled and maintained the lift up to the time of the occurrence and that it is liable for the injury resulting from the alleged defective condition. Defendant opposes this contention.

Plaintiff arrived at the filling station at about 10:00 a. m. Fraser was alone. He had been without a helper for more than a year. Plaintiff first put some air in his tires and mended one of them at the east side of the station, where that work was usually done and where the air hose was located. He talked with Fraser about having his car oiled and greased. Fraser, busy with other customers, went into a little brick building and came out with an iron handle or lever, which plaintiff testified Fraser gave to him. Plaintiff then drove his car around to the west side of the station where there was a hydraulic automobile lift used in the greasing of cars. Plaintiff had been purchasing gasoline and oil and having his car greased on these premises since 1939 and had made purchases at the filling station at least once every other day. Up to a year or more before the occurrence the greasing had been done by a helper and plaintiff took no part in the operation. He testified that he was told by Fraser that because of the shortage of help that if he wanted his car greased, he would have to do the work himself. He also testified that Fraser told him that if he, plaintiff, did the greasing himself, that he would charge him only half price, also, that he paid Fraser for the "materials" that were furnished to him for the greasing.

Plaintiff had greased his car about seven times prior to the occurrence. He had seen the lift operated about

45 times prior to the occurrence. He testified that Fraser showed him how to raise the lift by means of a lever which opened and closed certain valves. Without the lever the lift could not be operated. Plaintiff drove his car onto the lift. From bumper to bumper his car was about 15 feet in length, practically the same length as the rails or runners on the lift itself. He "centered" his car so that no part of it overhung the lift and then placed bricks at the wheels so that they could not move forward or backward. All this took place while plaintiff and Fraser were in sight of each other, not more than 15 or 20 feet apart. Fraser denied that he showed plaintiff how to operate the lift, or that he had given him permission to do so, but admitted that he got the handle or lever out so that the lift could be raised in order that plaintiff could grease his car. Plaintiff elevated the lift by moving the levers in the manner that Fraser had instructed him. The lift went up normally to its limit of five feet from the pavement. Plaintiff took the grease gun which Fraser had prepared for his use and went to work on his car. He was standing under the raised lift. No one touched the levers after plaintiff first raised the lift.

John Ephraim, plaintiff's witness, was sitting in a window on the second floor of a flat building on the south side of 31st street, opposite the station. He was watching the whole proceeding. He saw plaintiff drive in, and talk to Fraser on the east side. He testified that plaintiff drove his car around to the west side and upon the lift. He saw plaintiff hoist his car and stated that at that time Fraser was putting gas in an automobile. He did not see Fraser go back under plaintiff's car and connect the grease gun. He testified that plaintiff went under the lift; that four or five minutes later the lift came down about half way, when there was a pause or jerk and it went on downward; that it descended in not more than two seconds; that

plaintiff was under the end of the lift when it came down; that he saw Fraser hoist the lift high enough to put the safety leg under; that he, witness, was not sure whether plaintiff stepped over the safety leg going from the valves to the lift; that the safety leg was lying down right at the side, about one or two feet from the lift; that during the year prior to the occurrence he, witness, did not see the safety leg attached to the lift; that on all occasions when Fraser would use the lift, he always hoisted it and got the safety leg and put it under the lift; and that he put it under the lift by hand.

Fraser testified that on the morning of the occurrence he brought the safety leg and the handle of the lever to the lift; that he put the safety leg on the right hand side of the lift close to the station, between the station and the lift; that it was on the ground; that he put the handle to the oil valve on a used oil drum; that plaintiff's car was not then on the lift; that plaintiff was then on the east side of the station; that he, Fraser, brought the grease gun out at the same time and went to take care of a customer at the pump; that "the next he knew of it" he heard someone call out that there was a man under the lift; that he did not know the lift was up; that he manipulated the levers and raised the lift; and that the lift worked normally and without hesitation.  Plaintiff testified that after his car was elevated, Fraser came to the lift on the west side of the station, hooked up the grease gun and said to him; "Well, it's O.K., go ahead"; that before he had finished, the gun was out of grease; that in the meantime he found a rag and began to clean the grease terminal on the front spring; and that after the car had been elevated for about 10 minutes, the lift came down very fast, hitting him on the head, knocking him to his knees and rendering him unconscious.  He testified further that he saw nothing of the safety leg; that no one ever told him a thing about it; and that on his visits to

the station he had never seen such a thing attached, or anywhere about the station. Fraser testified that he had "never" shown plaintiff how to manipulate or operate the levers of the lift; that he had never shown plaintiff or anyone else how to operate the lift; that other than his helpers and himself, no one had ever, with his consent, manipulated the handles to raise the lift; that he always raised it himself; and that occasionally a customer who was doing his grease job would lower the lift, but that he, Fraser, always "protested to that." Fraser testified further that plaintiff had greased his car four times before the occurrence; that the day of the occurrence was the fifth time; that he had records of it; that on each of the four previous times he, Fraser, had elevated the lift and put the safety leg under it; and that on the day of the mishap he did not see plaintiff move his car from the east side of the station toward the lift.

A number of experts, mechanical engineers and mechanics, testified about the principles on which the lift works. It consists first of a tank buried in the ground. The tank should contain about 33 gallons of heavy ice machine oil. Near the bottom of the tank was a pipe with an inner diameter of one inch, which led from the tank to a cylinder underground at the base of the lift a few feet away. The pipe and the cylinder under the lift should contain an additional 15 gallons of oil, so that when the lift is at rest upon the ground, the system has an oil capacity of 48 gallons. This cylinder surrounded the piston on which the lift rises. When the lift was down, the metal piston beneath the runners or rails had descended 60 inches below the pavement, because it had to come up that distance above the pavement in order to rise to the height of 61 inches above the ground. Actually, the piston was eight or nine feet long, so that when it was raised to the height of approximately five feet, part of it remained underground in the cylinder to steady the

raised section. At the top of the inside of the cylinder, near the ground level, was a leather collar or packing, which was intended to seal the space between the piston and the surrounding cylinder and thereby prevent the oil from escaping from the cylinder. This packing was designed and intended to be oiltight, not airtight.

In the operation of the lift there is an air compressor operated by electricity. The compressed air is forced into the top of the tank, which should, when filled, contain 33 gallons of oil. A valve known as the air valve is opened. The compressed air is thus allowed to enter the top of the tank, and by means of this pressure the oil in the tank is forced downward and into the pipe near the bottom of the tank. Another valve controlling the flow through the pipe, known as the oil valve, is then opened almost simultaneously. The opening of this oil valve allows the oil, forced by the air pressure on top of it, to go through the pipe and into the cylinder around and beneath the piston. The air pressure must be strong enough to force the combined weight of the piston, the rails or runners, and a car (if one should be on the runners) up a distance of 61 inches from the ground. The valves are then closed and the runners are standing at rest at the height of 61 inches, supported by a column of heavy oil in the cylinder. This oil comes into the cylinder from the tank through a pipe one inch in diameter. To go out of the cylinder, the oil passes back through this pipe. The process is necessarily slow and would require from 20 to 28 seconds, according to defendant's witness Harshbarger, or 25 to 30 seconds, according to plaintiff's witness, Cook.

On the other hand, if there is an insufficient amount of oil in the system, the apparatus will work differently. The insufficiency may be so great that there is no oil at all in the tank, or the tank may be partly filled. In either case, when the compressed air is let into the tank, air instead of oil will be forced through the pipe

leading from the tank to the cylinder, and this air, under pressure, will, when it enters the cylinder, force the piston to rise to its usual height of five feet. The piston, platform and car are then supported by a column of compressed air in the cylinder, instead of a column of oil. If a slight leak in the packing or elsewhere should develop, the lift would descend rapidly, because air escapes through a leak much more rapidly than oil. A lift could be designed to operate solely on air. Such a machine would have to be airtight. This machine was not so designed and was intended, according to literature prepared by defendant and the testimony of its expert witness Harshbarger, to be used with oil, and the oil level according to both authorities should be within three or four inches of the top of the tank. Defendant knew this to be a fact as is evidenced by the booklet which was printed by it, and which it claimed to have distributed. It will be noted that most of the equipment, especially the parts of it which clarify the principle on which it works, was buried underground and had been long before Fraser ever came to this station.

It was on April 6, 1943, about 13 months prior to the mishap, that oil had been added to the lift, and at that time Cook, an employee of defendant, put in 15 gallons of Polar ice machine oil. From that time until the day after the occurrence no oil had been added to the mechanism. On the day after the occurrence 20 gallons was added to the tank and it was then full. Cook testified that he never instructed anyone in the method of adding oil to the tank and that to his knowledge no one but himself repaired any of the lifts in his district. Defendant's witness Harshbarger and the booklet agree that a monthly or bimonthly inspection of the oil level is necessary from the standpoint of safety. No such inspection was ever made. Plaintiff urges that the testimony of the expert witnesses shows that at the time of the occurrence there must have been

very little oil in the apparatus, not more than a gallon.

Plaintiff is completely paralyzed from the hips down and requires constant medical and nursing care. He was 39 years of age at the time of the occurrence and his earnings were $289 a month. His condition is permanent. There is no contention that the damages awarded are excessive.

Plaintiff's theories of the case are that defendant, as a lessor of land, is liable for injuries resulting from a dangerous condition on the premises which existed at the time of the leasing where the condition is latent and lessee does not know of it and the lessor knows of it and has reason to believe lessee will not discover it; that notwithstanding its written lease defendant did not relinquish control of the equipment, but continued to use it in the furtherance of its business, exercising whatever control was necessary to advance the interest of that business.

In considering the argument of defendant that the trial judge should have directed a verdict, or entered judgment notwithstanding the verdict, we recognize the well established rule that the sole question presented to the court is whether, admitting the evidence in favor of the plaintiff to be true, that evidence, together with all legitimate conclusions and inferences, fairly tends to sustain plaintiff's cause of action. We have no right to pass upon the credibility of the witnesses, to consider any purported impeachments, the weight thereof, or the weight of the testimony, since the motions admit the evidence in favor of plaintiff to be true, together with all legitimate conclusions and inferences. *Vieceli v. Cummings*, 322 Ill. App. 559.

We turn to a consideration of the contention of plaintiff that notwithstanding the lease, defendant continuously controlled and maintained the lift up to the time of the occurrence, and that it is liable for the injury resulting from its "defective condition." Previous to opening the station where the mishap occurred, Fraser

had been employed as a salaried operator by the defendant for several years. On September 16, 1938 Fraser and defendant executed a lease of the premises, together with the buildings, fixtures, equipment, machinery and appliances located thereon, for a term commencing August 16, 1938 and ending August 15, 1939. He agreed to pay the lessor as rent one half cent per gallon on all gasoline delivered to the station, and in any event, to pay a minimum rental of $29.90 per month. Each payment of rent was to be accompanied by lessee's affidavit showing the date and amount of each delivery for sale of gasoline during the month. Lessee convenanted as follows:

"That the lessee has examined and knows the condition of said premises and the buildings, equipment, machinery and appliances situated thereon, acknowledges that he has received the same in good order and repair .. . . and that no representation as to the condition or repair thereof has been made by the lessor. That lessee . . . will keep said premises, buildings, equipment, machinery and appliances, . . . in good order and repair; that he will keep said premises and appurtenances, including adjoining areas, alleys and sidewalks in clean, safe and healthful condition, . . . and that at the expiration of this lease, . . . lessee will surrender the premises to the lessor in substantially as good condition as when received, ordinary wear and tear, damage by fire, the elements or other unavoidable casualties excepted. If any equipment . . . used for dispensing petroleum products be used for dispensing products supplied by some one other than lessor, then lessee . . . agrees before such use to remove from such equipment all globes, . . . or other things identifying the products . . . or name of lessor."

An inventory signed by Fraser was attached as a rider. The inventory reads:

"Inventory of Standard Oil Company Equipment and Supplies in Good Condition. . . . 1 Lift—Hydraulic Rotary. . . . This rider to be attached to and made a part of the lease dated Sept. 16, 1938, and I hereby assume full responsibility for all articles of equipment listed herein during the term of said lease, or any renewal thereof."

On August 7, 1939 the parties executed a second lease. Lessee made the same covenants as to the inspection and the condition of the premises, agreed to keep them in repair, to return them in good condition and to remove globes and signs of the lessor when selling products other than those sold by lessor. This term began August 16, 1939 and ended August 31, 1940 and was to continue after August 31, 1940 for periods of six months until one of the parties should give ten days' advance notice of termination prior to August 31, 1940, or prior to the end of one of the six month periods. The inventory was taken September 2, 1941 and attached to the lease. This inventory was taken by A. Izzo, a clerk in the construction department of defendant. It was signed by the lessee. The inventory states that the equipment and supplies are in good condition. Lessee assumed responsibility for them. On February 9, 1943 the parties executed a third lease. The term began January 16, 1943 and continued to January 31, 1944 and for successive terms of six months each. Lessor might cancel January 31, 1944, or at the end of any six month term by giving ten days' advance notice. Lessee could cancel at any time by giving 30 days' advance notice. Lessee made the same covenants as to the inspection and condition of the premises. He again covenanted to keep them in good repair and to return them in good condition. He also undertook to indemnify lessor because of any claims for liability resulting from injury or other casualty to property or person, caused or occasioned by the appliances on the premises, or from any imper-

fection in the construction or installation of the same. The inventory was taken by R. S. Ashman, a clerk in the construction department. It recites that the equipment is in good condition and is signed by the lessee. On January 25, 1944, the parties executed a fourth lease. The term began February 1, 1944, and continued to January 31, 1945, and for successive terms of six months each, with the right of cancellation by serving ten days' advance notice. The lessee made the same covenants as to the condition of the premises. He covenanted to keep them in repair and also to return them in good condition. He again covenanted to indemnify the lessor. The inventory of the equipment was taken April 15, 1944, by R. S. Ashman. The inventory lists the items of defendant's "equipment and supplies in good condition." Included in this list was the hydraulic lift. The list is signed by the lessee. The lessee assumed responsibility for the equipment.

Defendant was in the business of manufacturing and distributing at wholesale and retail petroleum and other products. It had widely publicized trade names for its products. These trade names were displayed in many places about the gas station and the sign over the station was entitled "Standard Service." Newspaper advertisements authorized by the defendant up to the time of the occurrence invited the public to its stations, including the one where plaintiff was injured, for the purchase of its products. There was a clause in the lease by which defendant reserved the right of immediate cancellation if for any period exceeding 48 hours the premises ceased to function as a gasoline service station. Plaintiff states that although the lease sets out an assumption of obligation on Fraser's part to make all necessary repairs, it is clear from the testimony of Cook and other employees that there was no intention that this assumption should have any other than a paper effectiveness; that no employee or any other witness called attention to any substantial change

in the care, inspection or repair of machinery at the various stations by the construction department of defendant occasioned by the change over to the leasing arrangement; and that Fraser testified that he felt obligated to handle products of the defendant.

Defendant points out that Fraser purchased the merchandise and tools of a former tenant; that he, Fraser, obtained a permit from the State to sell products of all kinds; that he secured tank permits from the City; that in addition to the gasoline license he had a soft drink license; that during all the years from August 16, 1938 he had these permits and paid the license fees; that when he first began in August 1938 he hired a helper; that he fixed his salary, paid him and discharged him; that neither defendant or any other person had anything to do with Fraser's hiring of his helper, paying him or discharging him; that the same is true of each of his subsequent helpers or employees; that he, Fraser, paid social security tax on each; that all purchases which he made from defendant were on a cash basis; that the money which he received from sales of merchandise was subject to his disposal and control alone; that he sold alcohol, tires and Prestone; that he purchased some of the alcohol from defendant, some from William Huff & Company and other places; that he also bought Prestone from the same people; that he bought accessories from the Automobile Supply Company, such as bulbs, fan belts, etc.; that he purchased windshield wipers and vulcanizing equipment from Perlman Auto Supply; that he purchased heating oil from George McCambridge; that during the year of the mishap Fraser purchased from 1,000 to 1,500 gallons of fuel oil from Sinclair Refining Company; that he sold Coca Cola and other soft drinks; that he asked defendant to remove one of the tanks in order that he might save the license fee; that he paid the retailer's occupational tax and filed returns; that the overalls or uniforms worn at the sta-

tion were furnished by him; that he had sales tickets printed in his name, "Albert Fraser, Standard Oil Products"; that he sold merchandise to whomever he pleased; that he kept the station open at such times as he chose; that if he wanted to sell on credit, he did not ask anybody; that he sold at whatever price he fixed; and that neither defendant nor anyone else had anything to do with the prices at which he sold the products.

Plaintiff urges the following as bearing upon this question: 1. The sales department of defendant, through the construction division, maintained supervision over the condition of the machinery in question in exactly the same way that it had done when it admittedly operated and controlled the station. 2. During that former period, Fraser as an employee, was charged with the responsibility of calling defective conditions, so far as he could observe them, to the attention of his supervisor. 3. During the so-called leasing period, he was charged by habit and actual conduct of the parties with the same function. 4. The employee Cook made repairs on behalf of the Standard Oil Company on countless occasions without charge and whenever he did so tested and made notes of the state of all the machinery thereon and certified in writing to such action. 5. The safe condition of the machinery on the premises was not a thing which concerned Fraser alone, but served to advance the business interests of the Standard Oil Company itself and to increase its sales and promote public good will.

Plaintiff does not argue that Fraser was an employee of defendant and he did not so contend in the trial court. In a conference in chambers during which the trial judge discussed the proposed instructions with counsel, there was no objection to the giving of a proposed instruction, which was later given, that as a matter of law, on May 30, 1944, Fraser was not the servant or agent of defendant "in what he did or

failed to do in and about the operation of the filling station, or the equipment, including the hoist, thereon.'' We have read the cases cited by the parties and agree with defendant that the courts have uniformly held that the law of landlord and tenant applies wherever the station operator is in fact an independent contractor. See *Brown v. Standard Oil Co.,* 309 Mich. 101, 14 N. W. (2d) 797; *Texas Co. v. Wheat,* 140 Tex. 468, 168 S. W. (2d) 632; *Arkansas Fuel Oil Co. v. Scaletta,* 200 Ark. 645, 140 S. W. (2d) 684; *Hudson v. Gulf Oil Co.,* 215 N. C. 422, 2 S. E. (2d) 26; *Deep Rock Oil Co. v. Derouin,* 194 Wis. 369, 216 N. W. 505; *Mid-Continent Petroleum Corp. v. Vicars,* 221 Ind. 387, 47 N. E. (2d) 972. We are satisfied from a consideration of the record and the law applicable thereto that defendant did not control or maintain the lift. The lift was part of the equipment leased to Fraser. The relationship between defendant and Fraser was that of landlord and tenant.

The other theory advanced by plaintiff to sustain the judgment is ''that on January 25, 1944, the date of the last leasing of the service station to Fraser prior to the mishap, there existed a latent defect in the hydraulic lift, leased as a part of the equipment of the station, a defect of which the oil company had knowledge and one which it knew that Fraser, the tenant, could not by reasonable diligence discover.'' Plaintiff urges that the evidence shows that the shortage of oil in the lift was the proximate cause of the injury. Defendant argues strongly against this contention. We accept plaintiff's statement that there is evidence in the record which would warrant the jury in finding that the shortage of oil in the lift was the proximate cause of the injury.

The following excerpts from Vol. 16 of Ruling Case Law, under the heading of Landlord and Tenant, state the rules applicable to the facts presented by the record:

"In the absence of warranty, deceit, or fraud on the part of a landlord, the rule of caveat emptor applies to leases of real estate, the control of which passes to the tenant, and it is the duty of the tenant to make examination of the demised premises to determine their safety and adaptability to the purposes for which they are hired. Hence, for personal injuries received by him from latent defects therein, of which the landlord had no knowledge at the time of the lease, the latter cannot be held responsible. If, however, the landlord is at the time of the letting aware of the dangerous or unhealthful condition of the premises arising from latent defects, it is his duty to disclose such fact, and his failure to do so may constitute a fraud rendering him not only liable to the tenant for resulting injuries, but also authorizing the tenant to abandon the possession and thereby escape liability for future rents. This duty of disclosure does not spring directly from the contract, but from the relation of the parties, and is imposed by law. . . . Not only is the landlord liable to his tenant for the fraudulent concealment of latent defects but he is also liable for injuries therefrom to the members of the tenant's family, employees and other persons rightfully on the premises at the invitation of the tenant. . . . It is the generally accepted rule that whether there is a covenant to repair or not, the lessor will be liable for injuries caused by his negligence or unskilfulness or that of his servants and employees in making repairs to the leased premises, and it has been held that a landlord undertaking to repair leased premises at the request of his tenant, when under no obligation so to do, and who assures his tenant that such repairs have been made, is answerable to the tenant if the latter, relying on such assurance, suffers injury by reason of the defects not being properly repaired. The principle that governs in such cases is such that, although the landlord is not bound to repair in the absence of an express covenant to re-

pair, where no controlling statute interferes, and though his promise to repair, made subsequent to the execution of the lease, is without consideration, and hence is unenforceable, yet if he shall voluntarily and gratuitously undertake, during the term, to repair the demised premises, he is bound in so doing to use ordinary care and diligence. . . . It is the well settled general rule that the duties and liabilities of a landlord to persons on the leased premises by the license of the tenant are the same as those owed to the tenant himself. For this purpose they stand in his shoes. Visitors, customers, servants, employees and licensees in general of the tenant are on the premises as guests, etc., of the tenant, and not of the landlord. Whatever rights such invitation or license from the lessee may confer, as against such lessee, as against the lessor it can give no greater rights than the lessee himself has. The guest, servant, etc., of the tenant is usually held to be so identified with the tenant that his right of recovery for injury as against the landlord is the same as that of the tenant would be had he suffered the injury. With regard to the liability of a landlord to licensees of the tenant for injuries received from defects on the premises existing at the time of the lease, it is generally conceded that so far as any contractual liability is concerned, the rule of caveat emptor applies just as in a case where the injured person is the tenant himself, and that the landlord does not, by making the lease, impliedly warrant that the premises are safe, or fit for the use to which the lessee may intend to put them.''

Under the heading ''Liability to Strangers'' the author (in the same volume) says:

''The liability of the landlord to his tenant or those deriving their rights from the tenant having been considered, there now remains for discussion the question of his liability, as owner of the leased premises, to third persons who stand strictly on their rights as

strangers, such, for instance, as the owners or occupants of adjoining premises, or persons lawfully on the highway. Persons of this class, unlike licensees, servants, guests, etc., of the tenant do not derive their right to be where they are from the tenant, and the measure of the duties owing by the landlord to them is not, therefore, the same as that of his duties to the tenant. Generally speaking, a landlord is not liable to such strangers for injuries resulting from the misuse by the tenant of premises capable of a reasonable ordinary use which would involve no injury to third persons, or from a nuisance created by the tenant during the lease, whether arising from an affirmative act, or from the omission on his part to keep the premises in repair. . . . Where the liability of the lessor depends upon the condition of the premises at the time of the lease, there is no difference between an original contract of letting and the renewal of an existing lease. Whatever the condition of the premises at the time they were originally demised, if, when the lease was renewed, a nuisance existed thereon, the renewal is deemed an authorization by the lessor of the continuance of the nuisance. . . . If a nuisance is created during a term already existing, no liability falls on the landlord pending that term, for the reason that he has no legal means of abating the nuisance. He cannot enter upon the tenant's possession for that purpose, and would be a trespasser if he did so. But when the term expires, his right of entry and power to abate at once arise, and, for that reason, a liability commences. If he declines to re-enter and abate the nuisance, and relets the premises, the liability which arose at the termination of the term will be neither discharged nor evaded. The test of his liability in such a case is his power to have remedied the wrong. If he has but fails to exercise such power, his liability remains.''

A lessor of land, who conceals or fails to disclose to his lessee any unnatural or artificial condition involving unreasonable risk of bodily harm to persons upon the land, is subject to liability for such harm caused thereby to the lessee and others on the land with the consent of the lessee or a sublessee after the lessee has taken possession, if (a) the lessee does not know of the condition or the risk involved therein, and (b) the lessor knows of the condition and realizes the risk involved therein and has reason to believe that the lessee will not discover the condition or realize the risk. Restatement of the Law of Torts, vol. 2, sec. 358.

Plaintiff asserts that the shortage of oil in the lift was a latent defect which Fraser could not reasonably be expected to discover in view of the representations made by defendant. In arguing this contention, plaintiff states that Fraser, prior to leasing the oil station, had never before worked with a hydraulic lift; that defendant knew that; that for many years Cook, when Fraser was an employee and later when he was a tenant, had on behalf of the construction department of defendant repaired all the machinery in the various stations where Fraser worked; that Fraser could not help but know that for many years Cook had taken care of hydraulic lifts installed in numerous other stations of defendant; that when Cook told Fraser that the only way to determine whether additional oil was needed in the lift was by observing whether it staggered or shook while going up and down, it would be strange if Fraser did not believe him; that Fraser believed the representation in the lease that the equipment was in good condition; that he believed Cook's assurance that the lift had enough oil in it if it did not shake and jump in operation; that he believed the declaration that every time Cook did any work at the station that the equipment was in good order and free from defects; and that under the circumstances shown by the evidence Fraser could not have reasonably

known of the defective condition of the lift at the time of the letting or afterwards and that it was a latent defect.

■ We cannot agree that the shortage of oil in the lift constituted a latent defect. An automobile lift is a common instrumentality in use at garages and service stations. Plaintiff's witness testified that there were thousands of lifts identical to the one in use at Fraser's station. Fraser testified that he knew how to fill the lift and where to put the oil in. He had seen the mechanic put the stick in the tank of the lift in order to determine the amount of oil in it. Fraser also measured the quantity of gas in his gasoline storage tanks by a stick. It is undisputed that to remove the oil cap required a turn of a Stillson wrench. Cook, of the maintenance department of defendant, made the specific repairs requested by Fraser and nothing more. The construction man did not make a general inspection of the equipment at the station. The work order does not say that the lift was full of oil. It did not tell Fraser not to purchase oil. Defendant had never furnished oil for the lift. Fraser purchased all of the oil. Defendant could not compel Fraser to buy any oil. There was no duty on defendant to see to it that there was sufficient oil in the lift. That was Fraser's responsibility. Defendant's agents had never inspected the lift to determine whether or not it was full of oil during the time Fraser had operated the station. During the more than five years that Fraser had been operating the lift, defendant had never furnished any oil to go into the lift. The lift, on January 25, 1944 and at the time of the occurrence, was not defective. It was operated immediately after the mishap by Fraser and by policemen of the City of Chicago. There was no defect in the lift. The proximate cause of the injury, we assume, was the neglect to have a sufficient quantity of oil in the tank of the lift. This was not a concealed or latent defect.

The parties have argued the applicability of the principles stated in *West Chicago Masonic Ass'n v. Cohn,* 192 Ill. 210, and *Shields v. J. H. Dole Co.,* 186 Ill. App. 250. It will be observed that in the *Cohn* case the plaintiff was a third party, who stood in the position of a stranger to the lease. He was not a lessee, as was Fraser in the instant case, nor was he a licensee of the lessee, as plaintiff. The injury to Cohn occurred while the tenant was in possession under a third lease. Apparently, the parties in that case did not discuss the distinction between an action by a stranger and an action by a lessee or licensee of a lessee. As we have seen, a landlord is properly chargeable with liability to a stranger where the cause of the injury to the latter is a nuisance existing on the premises at the time of the demise. In the case of a stranger the liability of the lessor depends upon the condition of the premises at the time of the last leasing before the occurrence. The test of his liability in such case is his power to have remedied the wrong.

Whether the liability of a landlord is to be determined as of the time of the making of the original lease, or as the time of the making of subsequent leases, usually arises in cases involving injuries to strangers. There the rule is that where a nuisance exists through which a stranger is injured, the landlord cannot defeat the action even though the condition arose after the making of a lease, if prior to the making of a subsequent lease the landlord had an opportunity to enter the premises and abate the nuisance. In the case of a tenant or a customer or other licensee of the tenant the rule of *caveat emptor* applies. If a latent defeat existed at the time of the making of the original lease and was not known to the tenant, but known to the landlord, the landlord would be liable on the basis of fraud. However, where a tenant renewed his lease and a long period of time elapsed, it

would be likely that any defect in the premises arising during a previous term would become known to the tenant. A stranger would not have an opportunity to discover latent defects, whereas a tenant would, and the licensee, standing in the shoes of a tenant, would be in the same position as the tenant. The rule of *caveat emptor* would obviously, have no application to a stranger. Under the authorities the court erred in instructing that the jury might find the defendant guilty if on January 25, 1944, the day of the making of the last lease, there was a shortage of oil to such an extent that the continued use of the lift involved unreasonable risk of bodily harm to persons using it, that defendant knew of the condition, that Fraser did not, and that the defendant negligently failed to warn him, etc. Fraser, at the time of the mishap, had been in continuous possession for more than five years. There was no duty on defendant to Fraser or his licensees, such as plaintiff, to examine the lift on January 25, 1944, or at any previous making of a renewal lease, to see if the lift had an adequate supply of oil.

There is no contention that defendant, when it voluntarily repaired the equipment on the premises, did so in a negligent or unworkmanlike manner. Plaintiff, as a customer of Fraser, was a licensee and had no greater rights than Fraser, the lessee. Plaintiff was not a third party or a stranger. Plaintiff's right of recovery against defendant is the same as that of Fraser, had he suffered the injury. Defendant did not breach any duty that it owed to Fraser or to plaintiff, who was a customer of Fraser. We are satisfied that it was the duty of the trial court to have directed a verdict for the defendant. As the points considered dispose of the case, we will not extend the opinion by discussing the other points urged by the parties.

For the reasons stated, the judgment of the superior court of Cook county is reversed and judgment is en-

tered here for defendant, Standard Oil Company of Indiana, a corporation, and against plaintiff.

*Judgment reversed and judgment here.*

LEWE, P. J., concurs.

KILEY, J., specially concurring:

I agree that the record justifies but one conclusion as to the relationship between Fraser and the Company. Fraser was a tenant of the Company. Plaintiff's theory that the Company controlled the lift, therefore, falls. *Gulf Refining Co. v. Brown,* 93 F. (2d) 870; *Gulf Refining Co. v. Fox,* 11 F. Supp. 425; *Ashland Refining Co. v. Fox,* 11 F. Supp. 431, are not inconsistent with this conclusion.

The shortage of oil in the lift was the proximate cause of plaintiff's injury. The rule is that a landlord is liable where a dangerous condition, proximate cause of the injury, existed at the time of leasing, which was known by the landlord to exist, and the existence of which was not known by the tenant and was such that careful examination would not disclose it. *Borggard v. Gale,* 205 Ill. 511; and Restatement of Torts, chap. 13, sec. 358. It is my view that there is evidence that the shortage of oil was a dangerous condition, the existence of which the Company knew, or should have known, through Cook, and that it existed when the lease was made. Plaintiff sought to excuse Fraser from making a careful examination of the lift by proof that he acted prudently in relying upon Cook's instruction that the only way to tell whether the lift needed oil was to observe its operation to see whether it shook or jerked. I am of the opinion that the only reasonable inference justified by this record is that Fraser was imprudent in failing to make a careful examination which would have disclosed the shortage of oil. Plaintiff has no greater right than Fraser would have had against the company.